1. "The real ultimate criterion by which the merit of such testimony [newly discovered evidence] should be measured is the probability of a different result; and when that probability appears, the ends of justice require that a new trial be granted."
2. Special ground 2 does not show reversible error.
 DECIDED JUNE 13, 1946.
Ralph McDaniel and Vernon (Doc) Hammond were convicted on an indictment charging them with arson. They filed a motion for a new trial, which was overruled, and error is assigned on this judgment.
The State's evidence substantially shows that Joe Pippin testified for the State on direct examination: that about February 14, 1945 he lived out from Eufaula, Ala.; that he worked in Quitman County at a place known as the Morning Star; that he slept there; that at about 12 o'clock at night they closed the Morning Star and he went to bed; and that the witness and one Ruth Tuck were in charge of the business and were conducting the place for Fletcher Lawrence at the time it was destroyed by fire. He further testified that the owner of the business was not at the Morning Star when the fire occurred. The building in which the business was conducted belonged to Mrs. J. C. Gay. The witness closed the place of business about 12 o'clock on the night of the fire and went to bed. After he had gone to bed he heard the dog, which was also in the building, make a couple of lunges at the front door. This awakened the witness. He went to the door of the building. The door lacked about an inch and one-half of being closed. The door was a double one and did not meet. There was a window to the left of the door. The first thing the defendant saw when he looked out of the building was a car light on a pick-up Chevrolet truck. He did not know to whom the truck belonged, but the defendant, Doc Hammond, drove it most of the time. The two defendants were standing in front of the lights. The light was burning in front of the building. Doc Hammond had a bucket of something in his hand. Witness did not know what it was, but it was "mighty inflammable." Doc Hammond put the bucket under the corner of the building. Ralph McDaniel, the other defendant, struck a *Page 6 
match and threw it in the bucket and the building blazed up. Flames went nearly to the top of the building. By that time the witness had taken the bar from across the door and eased the door back and was looking "right at them, but they didn't see me." The defendants got in the truck and left. The witness grabbed the wash pan and threw water on the fire, but the water seemed to make the fire burn more. Within a few minutes the defendants returned to the burning building in the same truck. The witness removed the cash register. Ruth Tuck asked the defendants to get the sheriff, but they said they didn't want to. Neither of the defendants tried to help put the fire out. The witness smelled the gasoline in trying to put the fire out. The next day when the witness went to get the money in the "Rock Cola, to my sorrow," he found that someone had taken the money out. The night of the fire the witness threw the bucket a distance from the house. The defendants had set the bucket under the corner of the house. The witness carried it home with him the next day. When the witness moved to Panama City, he left the bucket in the house where he had lived near Eufaula, Alabama.
The witness was 35 years old and had been living in Eufaula about nine months before the fire occurred, and had moved to Eufaula from Columbus, Georgia. He worked at the Morning Star at the time of the fire, the day of the fire being the first day the witness had worked at the Morning Star in a week. He worked for Mr. Lawrence at a cafe Mr. Lawrence owned in Eufaula and he worked at the Morning Star. They kept at the Morning Star cold drinks, beer and wine and Rock Cola, or (and) juke box and occasionally cigarettes and cigars. Sometimes a couple at a time would dance. The building was straight, about 18 by 30 feet. In addition to the dancing place and the place where the stock of merchandise was kept, there were two bedrooms in the back with a kitchen between them. A number of people besides the two defendants came in the Morning Star to buy wine and beer. The witness did not remember the names of any except Mr. Kaigler, the sheriff, who came there about the time that the two defendants were there, previous to the fire. The three were in the building at the same time, but the witness did not know whether they were together. They did not leave together. The defendants left first. The sheriff left about 11 o'clock. The witness was not drunk; doesn't drink *Page 7 
on the job, and was on the job that day for 24 hours. He had dozed off when the dog barked. The dog belonged to Mr. Lawrence, the owner of the Morning Star, and stayed in the building at night. The door had no lock on it. It was closed with a bar. The witness had never had anyone to call him after he closed. The road by the building was much traveled and people were riding and walking past all through the night. The crack in the door would measure to the second joint of the index finger of the witness. The door was about 22 or 23 feet from the place where "the fire broke out." The witness had a clear view from the crack in the door and the window. The truck was about 30 feet from the highway when the witness saw it in front of the house. It was parked close to the building, parallel with the building and the highway. The witness saw the truck first, then saw the defendants standing in front of the lights of the truck. The floodlight in front of the building burned every night. The defendants didn't say a word or do anything. There were in the building a 32-calibre Smith and Wesson, an automatic shotgun, and a 22 rifle, and "I didn't get them. I am a man of peace and don't fight unless it is pushed on me." After the building was burning, the defendants got in the truck, drove around the building and thence toward Georgetown. The witness and Ruth Tuck threw all the water they could get on the fire. He called Ruth Tuck to help put out the fire. She did not come out until the defendants had left. The witness did not remember who the people were who came to the fire. He did not remember any of them or how many came except that the two defendants came back. "I sung it all over Eufaula." The witness told Fletcher Lawrence, the owner, the next day that Ralph McDaniel and Doc Hammond had set fire to the building. The witness knew nothing about the defendants being arrested, but he was the man who said that they set fire to the building. The witness returned to Eufaula immediately after the fire. He heard that Mrs. Gay, the owner of the building, had $500 insurance on it. Mr. Lawrence, who operated the Morning Star, had no insurance. Mr. Huguley was the first man who talked to the witness about the fire, and the witness told Mr. Huguley that the defendants had set fire to the building. Huguley went to Columbus to see the witness. The witness believes that the next person he talked to was Mr. Gormley, with the State police. The witness was *Page 8 
positive that he told Mr. Lawrence the next day that the defendants had set fire to the building. The witness testified that he had been arrested for "public drunkenness and the like," for resisting an officer, and for cutting his wife. When the trial came up for cutting his wife, she did not testify against him because "She knew I didn't do it on purpose." The witness was under bond in Eufaula for resisting an officer. The witness did not know how many times he had been arrested in Eufaula for public drunkenness, because he didn't keep an account.
Miss Ruth Tuck testified for the State: That in the month of February, 1945, she worked between Eufaula and Georgetown at the beer and wine place known as the Morning Star. Fletcher Lawrence employed her to be in charge. She and Joe Pippin were working at the Morning Star when the place burned. She had retired. She heard the dog barking and got out of the bed. She didn't see anything at that time. The building was not then on fire. Later Joe Pippin awakened her and told her that the building was on fire. That was about an hour after she got up the first time. She went out immediately and started to getting things out of the building and trying to put out the fire. She didn't smell any gas fumes. There was a can under the corner of the building that she had not seen before. The two defendants were at the Morning Star about 6 or 7 minutes after the fire. They were at the back of the building shooting rats. The witness noticed the tracks of the truck that had passed by the corner of the building that night. The tracks looked like the tracks of the truck of the defendants. Several persons talked to the witness about the fire after the building burned. When the defendants were down there a few minutes after the fire, the witness requested them to get an officer, and they stated they had rather stay there and shoot rats. They were shooting with a pistol. About eight or ten people came to the Morning Star between dark and the time of the fire. Joe Pippin and the witness were the only two people there at the time the witness learned of the fire. In a few minutes a negro drove by and stopped to help put the fire out. The defendants were the next people who came along. They were by themselves. Then other people came. It didn't take very long for the house to burn, as it was a wooden building. After the fire the witness went to Eufaula and spent the night with Joe Pippin. The *Page 9 
next day after the fire she heard Pippin say who he thought burned the building.
The defendants introduced Joe Crosby and Robert Watkins, soldiers in the United States Army, who testified that they were at the New Deal Liquor Store about one-half mile from the Morning Star, which was owned and operated by Lee Smith. They arrived there about 9 o'clock on the night of the fire. The two defendants were there also. The witnesses testified that from the time they arrived at the New Deal Liquor Store they remained there in company with the defendants, all having a party with the owner of the New Deal Liquor Store, Lee Smith, except that on one occasion and before the fire the witness, with the defendants, went to the Morning Star, purchased and drank a bottle of beer each, after which they returned to the New Deal Liquor Store and remained there until the fire at the Morning Star. Lee Smith was introduced and corroborated the testimony of the soldiers. He stated that his attention was called to the fire by shooting at the place of the Morning Star. At the time of this shooting the two defendants, he, and the two soldiers were at the New Deal Liquor Store. Smith further testified that the two soldiers, the two defendants, and he were having a drinking party after he had closed his place of business, and that no one else came in after he closed except two other soldiers.
W. D. Searcy testified for the defendants: that he had been on the police force for about two years; that he knew Joe Pippin, who lived in Eufaula; that Pippin's general character was bad at the time he lived in Eufaula. The witness did not know whether he could believe Joe Pippin on oath or not, since Pippin was always in some kind of trouble. Witness had arrested Pippin several times. Pippin was living in Eufaula at the time the Morning Star was burned. The witness had arrested Pippin for violating the law, for public drunkenness, and for cutting his wife and daughter, but the wife and daughter had refused to testify against him.
Fletcher Lawrence testified for the defendant that he was the owner of the Morning Star; that he had Ruth Tuck (or Dees) and Joe Pippin employed to operate the place for him on the night that the Morning Star was burned. The witness was not there. He had gone to visit his mother at Opp, Alabama (about 150 miles distant). The witness returned to Georgetown the afternoon after *Page 10 
the fire, about 5 o'clock; when he came in he said to Joe Pippin, "Well, what happened?" Pippin said: "Well, she just burned down last night and I liked to have got burned up in it." He testified further: "He [meaning Pippin] didn't say he knew who burned it, but just said he believed he knew. He did not tell me he saw anybody set fire to it, nor did he tell me that he saw any person set a can of gasoline down and strike a match and throw it in it. . . He didn't tell me he saw Ralph McDaniel and Doc Hammond there that night shortly before the fire. He told me that they were there in front of the truck with the lights on the truck; said my dog woke him up, and he went out and saw them there. He said they came down there to shoot some rats during the time the building was burning. He didn't tell me about seeing them that night before he closed nor whether or not he saw them there shortly before the building caught on fire."
The defendant, Ralph McDaniel, made a statement as follows: "The only thing I can not understand, if he knew we done it, why he didn't have us put in jail right then at that time instead of waiting four or five months to tell anybody that he seen us down there. I can not understand that, if he seen us."
The defendant, Doc Hammond, made a statement, as follows: "We went up to Smith's place about 9:30 or 10 o'clock. We stayed there all that night except one time we left and went down to the Morning Star and got two bottles of beer and carried two out to Joe Grossey and Bob Matkins, and we went back and stayed there the whole time. We never left until we heard somebody say the place was on fire, and we went down there right behind Joe and them; they left before I did."
1. Since the case is reversed on a special assignment of error on the ground of newly discovered evidence, we will not comment on the general grounds.
2. Special ground 1 of the motion is based on the affidavits of Tobe Adams and Fletcher Lawrence, the owner of the Morning Star which was the subject-matter of the arson. It will be noticed that Fletcher Lawrence testified at the trial of Ralph McDaniel and Doc Hammond. These affidavits are accompanied by the supporting affidavits required for the consideration of an assignment of *Page 11 
error based on newly discovered evidence. We will set forth the affidavits of Adams and Lawrence in full, omitting the formal parts. Tobe Adams' affidavit reads as follows: "Deponent is a resident of the County of Covington, State of Alabama, and the city of Opp, in said county, and has been all of his life. During the month of February, 1945, and some time previous thereto deponent was engaged in the taxi business, that transporting persons for hire by automobile. Deponent has known Fletcher Lawrence, who was reared at Opp, Alabama, all of his life. About February 14th, 1945, deponent had a trip to Eufaula, Alabama, to take a couple of passengers, and knowing that the said Fletcher Lawrence had a place of business at Georgetown, Georgia, across the river from Eufaula, Alabama, after he delivered his passengers at Eufaula he drove across the river to see his friend Lawrence. Deponent had on previous occasions, when on trips to Eufaula, gone over to the said Lawrence's place of business to see him; this place of business being known as the Morning Star, and wine and beer were sold there.
"On the occasion last referred to, to wit, Feb. 14th, 1945, when he arrived at the said Morning Star, which was about 10 o'clock in the evening, he asked for Fletcher Lawrence, and was told by the man in charge, whom deponent did not know, but whom he heard others on that occasion call by the name of Joe, that Lawrence was no longer there, and that he, Joe, had the place and was operating it. Deponent drank a bottle of beer or so, and stayed around the place for perhaps an hour talking to the man called Joe. The man Joe asked deponent if he would haul a load of stuff for him across the river to Eufaula; deponent asked him `What sort of stuff?' and was told by Joe that it was beer, that he had more than he wanted to keep at the place, and wished to take some of it to his home in Eufaula. Joe offered deponent $10 to do the hauling, and deponent agreed to do so. Joe loaded the truck and the back of the deponent's car with beer, the amount of which deponent does not know, but would judge it was about thirty-five cases of beer, and got in the car with deponent and they drove to Eufaula, to a house pointed out by Joe, where Joe unloaded the beer. On the way to Eufaula, Joe talked to deponent about buying a shotgun which Joe had put in the automobile when they left the Morning Star, saying he was taking the gun home. Deponent likes to hunt, and needed *Page 12 
a gun, and asked Joe what he wanted for the gun. Joe told him he would give him the gun in paying for hauling the load of beer, and deponent accepted it, and took the gun home with him at Opp, Ala.
"Deponent read something in the newspapers about the trial of Hammond and McDaniel at Quitman, Georgia, charging them with burning the Morning Star, and a few weeks thereafter, he met Fletcher Lawrence at Opp, Alabama, and got to talking with him about the burning, and in the course of the conversation told Lawrence about his having visited the Morning Star, about Joe telling him that he then owned the place, about hauling the beer for Joe, and about Joe paying him with the shotgun. Lawrence asked to see the gun, deponent took Lawrence to his home, and showed the shotgun to him which Joe gave him, and Lawrence identified the gun as being his property, and being the gun which he had left in the Morning Star on the day before the burning of the Morning Star; whereupon deponent turned the gun over to the said Fletcher Lawrence.
"Deponent did not know, and still does not know, either of the defendants, Ralph McDaniel and Vernon Hammond. He had never seen the man named Joe, herein referred to, before the transaction herein related, and has not seen him since, but could identify him should he see him again. Deponent has no interest whatever in the case of the State of Georgia v. Ralph McDaniel and Vernon Hammond. Should the said defendants be granted a new trial deponent would and will attend their trial in the Superior Court of Quitman County, Georgia, and testify to what is herein related.
"Deponent had not told any person of the transaction herein related with the man called Joe at the place of business of Fletcher Lawrence, called the Morning Star, at Georgetown, Ga., until he told Fletcher Lawrence of it some several weeks after the trial of the said Ralph McDaniel and Vernon Hammond. Deponent makes this affidavit with the knowledge that it will be used in support of the motion for new trial of the said Ralph McDaniel and Vernon Hammond. [Signed] TOBE ADAMS."
Fletcher Lawrence's affidavit is as follows: "Deponent is a resident of Quitman County, Georgia. Prior to February 14th, 1945, deponent was operating at Georgetown, Georgia, a place of business known as the Morning Star, at which wine and beer was sold, and *Page 13 
which was burned on the night of Feb. 14, 1945. Deponent was born and reared at Opp, Ala., and his mother still lives at Opp. On the morning of Feb. 14th deponent left Georgetown to go to Opp to visit his mother, and left one Joe Pippin in charge of the place of business called the Morning Star. Deponent had another place near Eufaula, Alabama, and Pippin, who lived in Eufaula, just across the river from Georgetown, worked for deponent where he was needed. Deponent was notified that his business had burned the next morning after the fire, and returned to Georgetown that same day. He questioned Joe Pippin about the fire, and Joe told him that he did not know who burned it.
"Ralph McDaniel and Vernon Hammond were indicted and tried at the September term, 1945, of Quitman Superior Court for the offense of burning the said Morning Star. Deponent went to Opp, Alabama, a few weeks after this trial, and happened to see Tobe Williams, who said he read in the newspapers about the trial of McDaniel and Hammond for burning deponent's place of business, and told deponent that he had been in Eufaula in February, had gone to the Morning Star to see deponent, was told by the man in charge that deponent no longer owned that business, but that he, Joe, was in charge; that this man Joe asked him, Adams, to take some beer to Eufaula to Joe's home, which he did, and that Joe paid him for the hauling with a shotgun. Deponent asked to see the gun, Adams took deponent to his home and showed him the gun. The gun thus shown to deponent by Adams was the shotgun which deponent left at the Morning Star on Feb. 14th, when deponent had left Joe Pippin in charge of the place, and which Joe Pippin testified on the trial of McDaniel and Hammond was in the place when it burned. Upon identifying the gun as his property, Tobe Adams turned it over to deponent, and deponent now has it.
"Deponent did not know any of the facts herein related until after Ralph McDaniel and Vernon Hammond were tried and convicted. Upon learning the said facts herein related, deponent immediately communicated them to Ralph McDaniel and Vernon Hammond, and to their attorney, A. H. Gray, this occurring during the month of October, 1945, in the latter part of the month.
"Deponent makes this affidavit with knowledge that it will be used in connection with the motion of McDaniel and Hammond for a new trial. Should they be granted a new trial he will be *Page 14 
present in court and testify to the facts herein stated. [Signed] FLETCHER LAWRENCE."
The defendants stated, among other things, that they did not know and had never seen Tobe Adams.
(a) New trials may be granted on newly discovered evidence (Code, § 70-204), but they are not favored. Jackson v. State,56 Ga. App. 250 (2) (192 S.E. 454); Southern Grocery Stores
v. Kelley, 57 Ga. App. 37 (194 S.E. 234); Brand v.Lawrenceville, 64 Ga. App. 357 (13 S.E.2d 214); Landers
v. State, 68 Ga. App. 804 (24 S.E.2d 139). This court is always reluctant to set aside a jury verdict which has the approval of the trial court. Nevertheless, it is our duty to grant a new trial if in our opinion the facts and law of the case demand it. There have been many decisions written pro and con regarding the question of newly discovered evidence. Generally, where a counter-showing is made, the trial judge becomes the trior of the issue thus joined. In this case there was no counter-showing. The testimony for conviction depends almost entirely on the evidence of Joe Pippin. According to his own admissions and the testimony of witnesses, he was not a citizen of ordinary admirable characteristics. We do not mention this to criticize in any wise the jury as to the verdict, because the credibility of witnesses is entirely for them, nor do we mean to criticize the trial judge for approving the verdict with the evidence adduced at the trial, but there are circumstances and instances connected with the case that are out of the ordinary. In view of such, the newly discovered evidence, which appears from the record to be clear and clean-cut, makes this ground more appealing. Some of the instances to which we refer are: the fact that even though Pippin claims to have told the owner of the business, Lawrence, that he saw the defendants set fire to the building, and Lawrence denied this, that he, Pippin, "sung it" all over the neighboring town of Eufaula, Alabama. Again, the grand jury of Quitman County convened in March after the fire in February, yet a serious crime of this nature was not presented to it for consideration. Then too, we have the evidence on the alibi which the defendants introduced. The defense of alibi, of course, was one for the jury. Yet in view of this and other circumstances in the case, viewed in the light of the newly discovered evidence, we are convinced that a new trial should be granted. In another trial it will go to the *Page 15 
credibility of the witness, Pippin, and it will not be merely cumulative or impeaching. We think in a crime of this seriousness, before the defendants should be convicted under all the circumstances concerning this appeal, a jury should have the benefit of the newly discovered evidence. The witnesses who furnished the main affidavits contained in this motion, though not living within the jurisdiction of the court, have pledged themselves to be present at another trial. If the jury should consider the newly discovered evidence creditable on another trial, they would be obliged to find that the chief witness, Joe Pippin, falsified when he stated that Fletcher Lawrence was not the owner of the business, but that Joe Pippin owned it; they would also find that Pippin committed a theft involving a shotgun and about 35 cases of beer. These would, of course, all be jury questions, but if they should find that the witnesses who made the main affidavits in the ground of newly discovered evidence were truthful, they might also consider whether he, Pippin, had a motive for burning the building. We realize that these are all jury questions, but it seems to us that the newly discovered evidence presents circumstances and facts which the jury should have for consideration. We think that this court in Todd v.Jackson, 24 Ga. App. 519 (101 S.E. 192), very aptly expressed the true rule in this language: "The newly discovered evidence offered in support of the motion for a new trial being of such a character as probably would, if credited by the jury, produce a different result upon another investigation, the trial judge erred in overruling the motion. Although newly discovered evidence may be somewhat cumulative of testimony previously introduced, and impeaching in its character, the real ultimate criterion is the probability of a different result. Mitchell v.State, 6 Ga. App. 554 (65 S.E. 326); Nolan v. State,14 Ga. App. 824 (82 S.E. 377), and cit.; Paden v. State,17 Ga. App. 112 (86 S.E. 287)." We are convicted that with the newly discovered evidence before the jury there appears a probability that there will be a different result on another trial. This court also held in Harper v. State, 50 Ga. App. 298
(177 S.E. 886): "The real ultimate criterion by which the merit of such testimony should be measured is the probability of a different result; and when that probability appears, `the ends of justice require that a new trial be granted.'" This ground of *Page 16 
the motion for a new trial is meritorious, and a new trial is granted thereon.
(b) The only other amended ground complains of the following charge of the court: "Should you find the defendants guilty, the form of your verdict would be, `We, the jury, find the defendants guilty and fix their punishment at not less than blank years, naming the years, nor more than blank years, naming the years, in the penitentiary.'" The defendants were generally indicted and by agreement jointly tried. The gist of the assignment of error is that the court should have instructed the jury that they would be authorized, if they believed the State's evidence beyond a reasonable doubt, to find one of the defendants not guilty and the other guilty, and if they should find both guilty, they would be authorized and not bound to fix the punishment of each the same. Under the facts of this case, the court committed no error as contended in this ground. By consent of the parties, and approval of the court, they were both tried together. The evidence is identical as to each. So far as the State's evidence is concerned, both defendants were present, each of them engaged at the same time in setting fire to the building. There does not appear from the record any reason why the jury should have found one guilty and the other not guilty, or in finding both guilty, why one degree of punishment should be meted out to one and a different degree to another. See, in this connection, Clackum
v. Bagwell, 40 Ga. App. 831 (151 S.E. 689). See also 23 C. J. S. 874, § 1294, and People v. Cleaver, 365 Ill. 93
(5 N.E.2d, 463). This special ground is without merit.
The judgment is reversed solely on the ground of newly discovered evidence.
Judgment reversed. Broyles, C. J., and MacIntyre, J.,concur.