## STATE v. PETERSON.

No. 7757.   Decided February 7, 1952.   (240 P. 2d 504.)

See 52 C. J. S., Larceny, sec. 140. Res gestae in criminal cases. 20 Am. Jur., Evidence, sec. 559.

*EksAyn Anderson,* Salt Lake City, *P. N. Anderson,* Nephi, for appellant.

*Frank E. Moss,* County Atty., Salt Lake County, Salt Lake City, *Brigham E. Roberts,* Dist. Atty., Salt Lake City, *Clinton D. Vernon,* Atty. Gen., of Utah, *J. Lambert Gibson,* Deputy Atty. Gen., of Utah, *Francis C. Lund,* Asst. Atty. Gen., of Utah, for respondent.

WOLFE, Chief Justice.

The appellant, defendant below, was charged and tried for the commission of the crimes of burglary in the second degree and grand larceny. From a conviction of the latter crime, he prosecutes this appeal.

At the trial the State produced evidence to the following effect: The complaining witness, one Clarence Means, owner of a tavern on Main Street near Fifth South in Salt Lake City, closed his establishment for the night at about 1:00 a. m. on March 25, 1951, checking the doors and windows to make certain they were locked. Later that same morning Daniel A. Dun and Edward Peterson while standing on Fifth South a short distance east of a driveway leading to a rear entrance of the tavern, observed an automobile drive out of the driveway at an unusually fast rate of speed, turn right on Fifth South and proceed west on that street for at least a block. The trunk lid on the automobile was partly up and they noticed an object in the trunk which appeared to Peterson to be a safe. He further observed that the numerals on the license plate were 484 and that there were two persons in the automobile. After the car disappeared, Peterson and Dun investigated the buildings along the driveway and found a window pane broken and a door partly open in the rear of the tavern. Dun called the police at about 3:55 a. m. and officers arrived shortly thereafter. There were bars on the outside of the broken tavern window but in the opinion of one of the investigating officers, a. person the size of the defendant could squeeze between the bars.

At approximately 3:50 a. m. Jack Merrick, a special officer, while patroling along Second South near Fifth West, noticed an automobile traveling north on Fifth West; two persons were in the car; the trunk lid was partially open and a black article hung out of the trunk, blowing in the breeze. Merrick later found out that the object was a Navy peacoat or an overcoat which was wrapped around a television set. Merrick pursued the automobile north on Fifth West until it turned into an alley on the left side of the street between North Temple and South Temple Streets. There the car stopped, the two men got out and fled on foot. Merrick chased the driver and overtook him after firing two shots in the air and in the ground. He identified himself as Chick or Chuck Peterson and stated that his companion was Kenny Solomon. Merrick took Peterson with him to a nearby planing mill to telephone the police. While he was making the call at about 4:00 a. m. Peterson disappeared.

The automobile which Merrick had pursued and which came to a stop in the alley was a 1941 Pontiac owned by the defendant. The license plates bore the numerals 484. Investigating officers found in the car a television set, an electric drill, and other miscellaneous articles, all of which, except for an overcoat and a Navy peacoat, Means, the tavern proprietor, identified as his property taken from the tavern.

Two days later the defendant went to the Salt Lake City police department and submitted a purported written confession by one Charles Olmsted to the crime.

The defendant testified to the following effect: On the evening of March 24, the defendant and his wife left their home at about 10:00 p. m. and drove in their 1939 Dodge coupe to a night club at about Thirtieth West and North Temple Streets. There they danced and the defendant played in the band until about 1:15 a. m. when they left and returned home. Upon arriving home, the defendant

noticed that his 1941 Pontiac which was parked in the yard when they left was missing. He had been negotiating with one Charles Olmsted endeavoring to sell him the Dodge, but he had not given anyone permission to drive the Pontiac. After walking home with his grandmother who had been staying with his children during the evening, the defendant returned to his home and retired to bed at about 2:00 a. m.

Later, the defendant and his wife were awakened by the telephone. It was Charles Olmsted calling who stated that he had the defendant's Pontiac and that it was stalled on Fifth West between Second and Third South Streets. In response to Olmsted's request for help, the defendant hurriedly dressed himself, rushed off without a coat and ran down Fifth West two or three blocks from his home to where the Pontiac was stalled. Observing that there was a television set in the trunk of the car, the defendant inquired of Olmsted where he obtained it. Olmsted replied that he had stolen it and the defendant demanded that he get it out of his car immediately. After getting the car started, the two men drove north on Fifth West with Olmsted at the wheel. He drove in an alley near the defendant's home and stopped the car. Another car driven by Merrick followed them into the alley. Olmsted fled from the car and shouted to the defendant to run. Being frightened and panicky, and by the influence of suggestion, the defendant ran until he realized he had no reason to flee. He then went to Merrick who asked him what was in the trunk of the car. The defendant told him that it was a television set which belonged to a friend of his. He walked with Merrick a short distance to a planing mill to call the police and while Merrick was placing the call, the defendant walked to his home which was nearby. He sat at home for about thirty minutes and then walked over to his grandmother's house a block and a half away, and in a short time Olmsted and the defendant's wife came there. The defendant complained to Olmsted about what had occurred and Olmsted in the presence of the defendant, his wife and grandmother, wrote on his

operator's license a confession to the theft. Two days later the defendant personally delivered this confession to the police department. The defendant's wife and grandmother corroborated the defendant's testimony as to those matters which occurred in their presence.

The defendant assigns as error the failure of the trial court to direct a verdict of acquittal in his favor. We find no error in this regard. Extended argument of the State's evidence set out above is not necessary to demonstrate that there was competent evidence adduced ██ from which the jury could find beyond a reasonable doubt that the defendant perpetrated the crime of grand larceny. When such competent evidence appears in the record, there can be no error in failing to direct a verdict of acquittal. While the defendant presented an account of his conduct during the early morning hours when the crime was committed, the jury was not constrained to believe his testimony even though it was corroborated in many details by his wife and grandmother.

The defendant further complains that the lower court erred in refusing to admit in evidence the purported written confession of Charles Olmsted to the crime. It is claimed that the purported confession which was written on Olmsted's operator's license and signed by him while █ at the home of the defendant's grandmother comes within the res gestae exception to the hearsay rule. The defendant set the time of the signing of the purported confession as at least one hour after he returned home after having been pursued by Merrick. Assuming that Olmsted was the other man in the Pontiac, there is no evidence as to his whereabouts from the time he fled from Merrick to the time he purportedly signed the confession to the crime at the home of the defendant's grandmother. There is nothing to show that it was a spontaneous act growing out of the excitation engendered by the events which had transpired. On the contrary, due to the fact that at least one hour elapsed from the time Olmsted eluded his pursuer

to the time he purportedly made the confession, during which time his activities are unknown, there is present in the case the probability that the confession was made by deliberate design. The author in a concurring opinion in *State* v. *Rasmussen*, 92 Utah 357, 68 P. 2d 176, 183, observed that

"the so-called res gestae is in fact simply another exception to the hearsay rule, based on the fact that there are assurances sufficient to make it reliable even though there is no opportunity to cross-examine. But that assurance based on the spontaneity necessary to make it the automatic result of the excitation engendered by the occasion and to eliminate any probability that it was the product of reflection or rationalization must be present. * * *

"It should be noted that since the sole basis for admitting statements of this kind depends on what we have chosen to call their 'automatic' nature, the court should be fairly well convinced that such basis exists; otherwise, statements of witnesses in regard to which there may be no opportunity to cross-examine will be admitted to the great prejudice of the opposite party."

It is readily apparent that the extra-judicial purported confession of Olmsted cannot meet this prescribed test. Because of the time and the circumstances surrounding its making, it lacks the characteristics which allow the relaxation of the hearsay rule. The trial court properly excluded from evidence the "confession" of Olmsted.

On cross-examination the defendant, in response to the question whether he had ever been convicted of a felony, replied that he was convicted in 1947 of grand larceny and in 1949 or 1950 of the unlawful sale of government property. He now assigns as error the failure of the trial court to instruct the jury that this testimony bears only on his credibility as a witness but is not probative on the question of his guilt in this case. The record reveals that prior to the instructing of the jury, both the district attorney and counsel for the defendant (not the same as his counsel in this court) stated that they

had no objections to the instructions. No exceptions were taken to them. Consequently, in accordance with our long standing practice of refusing to review matters not excepted to in the trial court, the failure of the trial court complained of by the defendant is not properly before us. This rule is founded on sound principle. This court being one of review in cases of this kind, we should first allow the trial court the opportunity to rule on matters brought before us for consideration. As was stated in *State* v. *Dubois,* 98 Utah 234, 98 P. 2d 354, 360:

"Having approved the instructions as given and requested no others, counsel should not be heard to complain that the court did not constitute itself counsel in the cause, and submit other theories not urged by defendant just because the court may think such theories of defense could have been urged. It is the court's duty to try the issues made by the parties and not to make cases for them. We have held that where instructions are palpably erroneous to such an extent that they would, if followed by the jury, prevent a fair or proper determination of the issues, we may notice the error without exception having been taken. *State* v. *Cobo,* 90 Utah 89, 60 P. 2d 952; *State* v. *Waid,* 92 Utah 297, 67 P. 2d 647. But we are aware of no holding that the mere failure to give an instruction which might have been given but which was not requested or called to the attention of the court, and no exception taken to the failure to give it will be noticed on appeal."

There is no error. Judgment affirmed.

WADE, McDONOUGH, CROCKETT, and HENRIOD, JJ., concur.