475 P.2d 543

**STATE of Utah, Plaintiff and Respondent,**

**v.**

**Douglas JOHNSON, Defendant and Appellant.**

No. 11943.

Supreme Court of Utah.

Oct. 8, 1970.

Ronald N. Boyce, Salt Lake City, for defendant and appellant.

Vernon B. Romney, Atty. Gen., Lauren N. Beasley, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

CROCKETT, Chief Justice:

Defendant Douglas Johnson was convicted by a jury of first-degree murder for the shooting of his former wife, Gwendolyn Johnson, on the street in Tooele, Utah, at noon on March 25, 1969. The jury recommended leniency and he was sentenced to life in the Utah State Prison.[1]

In attempting to overturn his conviction, defendant complains of three matters which he contends deprived him of a fair trial: (a) that the jury selection procedure resulted in an exclusion of married women; (b) the admission of colored photographs; and (c) an instruction given concerning defendant's plea of insanity

Defendant and the deceased had been married in Kentucky in 1959 when she was 14 and he was 23. As brought out in the trial there had been a great deal of strife and violence between them during their

1. See, 76-30-4, U.C.A.1953.

marriage. Among other things, he said that their difficulties and quarreling were such that his wife complained so much to his superior officers in the army that he was demoted from his rank; and he went A.W.O.L. in order to take her back to Kentucky. Consequently he was given an "undesirable discharge." As a result of quarreling over who should care for the couple's two children, during the year 1963 she had stabbed him with a knife so that he had to be hospitalized. He had filed for a divorce which was dropped. She left him in May 1968. When he tried to force her to return with the children, he was charged with an offense he called "Detaining a Female Against Her Will." He claims the charge was "cooked up" by his wife and her grandmother; and that he pleaded guilty for the sake of the children. While he was in jail for that offense, he was served with divorce papers and an interlocutory decree was entered in July 1968. Gwendolyn Johnson came to Utah, where she went to stay with a half brother in Tooele. The defendant says that when he was released from prison in February 1969, he did not know there was a final divorce; that he contacted Gwendolyn by phone and urged her to come back to Kentucky. He avers that she said that she "would think it over."

The defendant bought a 38-caliber pistol and ammunition and came to Salt Lake City by bus, arriving in the early morning hours of March 25, 1969. He rented a car and drove to Tooele, where, after some preliminary inquiry, he decided to wait outside Darrell's Beauty College on Main Street, where his wife was working, for her to come out. About noon she came out, got in a car with two men and was hugging and kissing the man at the wheel. After a few minutes, when Gwendolyn got out of the car, defendant says he tried to approach and talk to her, but she began to run and scream. His story continues: that the next thing he remembers is that "This pistol was in my hand and I was firing." The evidence is that he chased her around the car, firing five shots, three of which struck her, resulting in her death. He ran and jumped in the rented car and drove toward Salt Lake City. He was apprehended and arrested enroute, with the reloaded gun in his possession.

The foregoing narrative, told largely by the defendant, when he knew the lips of his ex-wife were sealed, could have been regarded by the jury as having a hollow sound. They were not obliged to believe it whole-cloth.[2] There is a basis therein upon which they well could have thought that he was unjustly blaming his wife for

2. See In re Richards' Estate, 5 Utah 2d 106, 297 P.2d 542, and authorities therein cited under footnote 13 thereof; 30 Am. Jur.2d, Evidence, Sec. 1083; 32A C.J.S. Evidence § 1038, p. 727, et seq.

their troubles; that he armed himself with a gun and came to Utah for the purpose of dealing with, and perhaps of killing her, which purpose he proceeded to carry out, except that after all of the blame put upon her in justification for what he would do, he contends that the final act was done in such a frenzy that he does not recall the detail thereof. Yet he seemed to have sufficient presence of mind to attempt to escape until apprehended by the officers.

Defendant's first argument is that he was in some manner prejudiced by an exclusion of married women from the jury because there were only six of them in the list of 50 jurors. The selection of juries is governed by statutes. The pertinent sections of our code (U.C.A.1953) are: Sec. 78–46–14 provides for a jury commission to select persons "of good repute for intelligence and honesty" and to "endeavor to promote only the impartial administration of justice," and further, in Sec. 17, to select the names from "legal voters on the assessment roll of the county." Sec. 59–8–1 provides for the keeping of an "assessment roll" which is the book in which the "valuation of all property" is recorded. Sec. 59–3–1 states that "property is to include personal property." It is thus properly concluded that the selections should be from the assessment roll of both real and personal property owners.[3]

The method of selection of juries as set forth in our statutes has from time immemorial provided a practical, convenient and satisfactory means of selecting jurors in accordance with the desideratum, and the mandate of our law, " * * * to promote only the impartial administration of justice" ; [4] and certainly is neither designed nor has the effect of the exclusion of any particular class of eligible persons from being used as jurors.[5] We reject any argument as to impropriety in the procedure so prescribed.

Defendant postulates that only the real property assessment rolls were used; and that this minimized the number of married women, which for some reason, unstated by him, and inscrutable to us, resulted in a jury unfair to him in a trial for killing his ex-wife. On this point the record is somewhat sparse, but what there is indicates to the contrary. With respect to jurors from Dugway (a military installation) the County Recorder testified: "We know everything in Dugway is personal property because no one is able to hold [real] property out there"; and further stated that the lists of both real and personal property

3. State v. Beasley, 22 Utah 2d 423, 454 P.2d 880.

4. Sec. 78–46–14, U.C.A.1953; and see Brown v. Allen, 344 U.S. 443, 474, 73 S. Ct. 397, 97 L.Ed. 469 (1953).

5. See Hoyt v. Florida, 368 U.S. 57, 62, 82 S.Ct. 159, 7 L.Ed.2d 118.

owners were used in selecting prospective jurors. The strongest statement for defendant's position that the record would justify is made in his brief, that "There is some confusion in the testimony * * * [as to whether both real and personal property assessment rolls were used] * * *" and further "* * * that the jury was *probably* selected from only the assessment roll of real property owners; at least, the State failed to show that both rolls were used * * *."

 Probabilities do not establish facts.[6] When one attacks his conviction of crime on the method of jury selection, the burden is upon him to show that there was some impropriety and that there is at least some likelihood that there was unfairness to him so that he was deprived of his right of trial by an impartial jury,[7] a burden which defendant has not met.

 Defendant's complaint about admitting in evidence color photographs of the deceased after the shooting is that their tendency to inflame the passions of the jury against him would outweigh any probative value they might have, citing State v. Poe.[8] There is some sort of paradox involved where one commits a heinous act and then complains that the very sight of what he has done is so revolting to the sensibilities of normal people (the jurors) that it would so distort their judgment that they could not fairly determine his guilt or innocence of crime. The prosecution was duty-bound to prove all of the elements of the crime by whatever evidence was available. This included the photographs. The defendant is entirely mistaken in asserting that because the fact of his shooting his ex-wife was not disputed the pictures were not necessary as proof. At the time the photographs were offered he had not so admitted and his counsel challenged through cross-examination all testimony concerning the defendant being at the scene of the crime.

 We have but recently pointed out that where pictures are probative on an essential issue they are not necessarily incompetent because they are gruesome; and that this is not changed because they are corroborative of other testimony.[9] As stated in the cases above referred to, the question as to the propriety of admitting such evidence is largely within the discretion of the trial court. Inasmuch as it does not appear there was any abuse thereof its ruling thereon will not be disturbed.

6. See Alvarado v. Tucker, 2 Utah 2d 16, 268 P.2d 986.
7. See Fay v. N. Y., 332 U.S. 261, 285, 67 S.Ct. 1613, 91 L.Ed. 2043; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; Tarrance v. Florida, 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572; United States v. Greenberg, 200 F.Supp. 382, 387 (D.C.); Woods v. Munns, 347 F.2d 948 (10th Circuit 1965).
8. 21 Utah 2d 113, 441 P.2d 512.
9. State v. Jackson, 22 Utah 2d 408, 454 P. 2d 290; see also State v. Renzo, 21 Utah 2d 205, 443 P.2d 392.

Finally defendant claims error in giving instruction 12A concerning defendant's plea of insanity, specifically wherein the court essayed to explain that insanity is involved in determining the question of guilt or innocence only when it renders the accused irresponsible or partly irresponsible, and indicated that it may be a complete defense, or reduce the degree of crime, or may have no bearing on the question.

Without burdening this opinion with an extenuation of the sophistries of defendant's argument we dispose of that contention with two observations: First, there was no objection to the instruction in the court below, hence it will not be reviewed upon appeal unless it clearly appears that an injustice resulted, a circumstance we do not find here.[10] Second, upon a review of the total instructions as given, the matter complained of in 12A was sufficiently explained. In instructions 12B and 12C the jury was adequately advised that the defendant should not be held responsible if he was insane; and that the evidence concerning it might be considered in reduction of the degree of the offense. On this point it is also significant that the evidence most favorable to defendant concerning insanity came from the expert called by the defense, who testified only that from the circumstances leading up to the crime the defendant's "inhibitions would be very limited." We see no error prejudicial to the defendant in the instructions given as related to the evidence.

Judgment affirmed.

CALLISTER, TUCKETT, HENRIOD and ELLETT, JJ., concur.

---

10. See State v. Taylor, 21 Utah 2d 425, 446 P.2d 954, and authorities there cited.