**The STATE of Utah, Plaintiff and Respondent,**

v.

**Gypsy Allen CODIANNA, Irvin Paul Dunsdon and Craig Marvell, Defendants and Appellants.**

**No. 14248.**

Supreme Court of Utah.

Dec. 29, 1977.

---

Robert Van Sciver and Randall T. Gaither, of Athay, Bowan & Van Sciver, Salt Lake City, Bryce K. Bryner, Helper, S. J. Sweetring, Price, for defendants and appellants.

Vernon B. Romney, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, Ronald B. Boutwell, Carbon County Atty., Price, for plaintiff and respondent.

WILKINS, Justice:

All statutory references are to Utah Code Annotated, 1953, as enacted in 1973, Title 76, Utah Criminal Code, unless otherwise indicated.

On August 8, 1975, Defendants Gypsy Allen Codianna, Irvin Paul Dunsdon and Craig Derrickson Marvell were convicted by a jury in the District Court for Carbon County of the crime of murder in the first degree of Michael Hogan in violation of Section 76–5–202(1)(d), as enacted in 1973.[1] After the return of the verdict, each defendant in person and by his attorney waived the jury for the penalty phase of the trial, which was held before the Court.[2] At that hearing the Court considered mitigating and aggravating circumstances, determined that the death penalty should be imposed, and sentenced each defendant to

---

1. The information charged: " . . . said defendants . . . intentionally and knowingly caused the death of Michael Hogan, while the defendants were engaged in the commission, or attempted commission or flight after committing or attempting to commit burglary or kidnapping."

2. Utah's Criminal Code provides in capital cases for a penalty or sentencing hearing by the jury, or court if the jury is waived, after the guilt or innocence phase of the trial. See specifically Secs. 76–3–206 and 76–3–207.

death by shooting at the Utah State Prison. Each defendant appeals.

During the guilt phase of the trial the State called the victim's roommate, Ralph Muncy, who testified that shortly after midnight on April 9, 1975, he and the victim were awakened by loud knocking on the door; that he heard a voice call out "Hey, Hoagey, it's me, Cowboy"; that the victim opened the door, and the three men entered, whom Muncy could not identify as it was dark; that one of these men held a rifle to Muncy's head and told him to go back from where he came; that then the three intruders and the victim struggled and Hogan was dragged outside, calling to Muncy to summon the police; that Muncy heard three gunshots, ran to the door, and saw a truck driving away; and that he searched the area for Hogan and did not find him, but found two blood stains, one in the driveway, and another on the road.

The State also called as a witness, Lee Heath, a neighbor of the victim, who testified that he heard a gunshot at approximately 12:30 a. m. on that April 9th and then two more gunshots in quick succession; that he saw three men climb into a 1957 or 1958 light colored truck near the victim's driveway, and that one of the men resembled Defendant Marvell, whom he knew, but he could not see the others in the dark; and that he called the police and helped Muncy search the area for Hogan, and also observed bloodstains. He later identified a truck at the police yard as the same truck he had seen that night. He also testified that he knew Defendant Dunsdon, who called himself "Cowboy".

Utah Highway Patrol Troopers Wilberg and Nordfelt, responding to a radio dispatch, stopped the three defendants in a light green pickup truck at approximately 1:00 a. m. on April 9th at an area called Blue Cut, at the mouth of Price Canyon in Carbon County. Defendants Marvell and Dunsdon had blood on their clothing, which proved to be type O, the blood type of the victim.

Trooper Wilberg found a partially disassembled .22 caliber rifle and several .22 caliber shells behind the seat of the truck. He also found bloody men's underwear as well as pink powder on the floorboards of the vehicle. The underwear was later identified by Muncy as the clothing the victim was wearing that night.

The troopers followed fresh tire tracks in the snow into Price Canyon, and then into Crandall Canyon, where they discovered the trail of an object having been dragged in the snow. Following this track, the troopers discovered the body of the victim. They also found two beer cans, one of which had pink powder on the top of it, and three different sets of footprints. Pictures were taken of the tire tracks in the canyon, which appeared to be made by the same type of tire as those on the truck in question. Soil samples were taken from the truck and from one of the beer cans found near the victim's body, which proved to be identical.

Thirteen .22 caliber bullets were removed from the victim's body, four of which had sufficient markings to show that they had been fired from the rifle found in the back of the truck mentioned above. The State's medical expert, a medical doctor, testified that he observed an estimated fifty abrasions and contusions on the face, chest, arms, legs, and back of the victim's body. This expert said some of these had the appearance of being bruises caused by dragging a body, but many others had the appearance of having been caused by blunt objects applied with great force. A bone in the victim's neck was broken, indicating manual strangulation. The doctor testified that the victim died of multiple gun shot wounds and/or strangulation.

At the penalty hearing, many witnesses, including each of the defendants, testified that the three defendants had attended a beer party on the evening of the 8th of April, at which large quantities of beer were consumed; and that small yellow pills, which the defendants recognized as valium, were passed around, and marijuana was smoked.

Defendant Marvell testified that he and Codianna had been drinking beer prior to

the party, and had had plenty to drink there. He also had taken two "yellow jackets" prior to the party, and in all had taken about 15 "downers" on the 8th of April. He testified that he remembered nothing of the events of that night. He did not remember leaving the party.

Further Marvell testified that he was married but had been separated from his wife for more than a year; that he has four children; that he was raised by his grandmother until he was eight years of age; that he lived with his mother and stepfather until he was fourteen when he left home; and that he met Codianna in California and stayed with him for a month immediately before coming to Utah, from whence he and Codianna intended to go East.

Defendant Codianna testified that he had taken a couple of thorazine tablets about two in the afternoon, prior to the party, had drunk about two pitchers of beer there, had participated in three or four "joints" of marijuana and had taken three or four valium pills. The effect on him, he stated, was to make him lose his memory, get lightheaded, and lose his judgment.

Further, Codianna testified he was twenty years of age; that he was adopted at nine months; that he had been in twenty-five foster homes, seven boys' homes, and three juvenile halls; that he had no relatives and was not married; that he came to Utah with Marvell and two other persons and had been in the State four days before April 8, 1975, intending to go East with Marvell the next day; that he went to the motel where he and Marvell were staying and picked up his (Codianna's) rifle, which he loaded and gave to Marvell; that the only reason the rifle was taken was for protection as the victim was supposed to have a shotgun and had threatened to shoot someone; that at the victim's residence, he saw someone talking to Dunsdon and then heard a couple of shots; that he didn't know the victim was in the back of the truck until he was in a canyon, where he put the victim in the front seat; that he remembers helping the others drag the victim off the road and into the snow; and that he did not shoot the rifle on the evening in question but disassembled it afterwards.

Defendant Dunsdon testified that he had arrived at the party around 10:30 p. m., and within the space of an hour and a half, took four valium pills, drank about ten cups of beer, and had a couple of puffs on a "joint" of marijuana. He and his girlfriend had smoked marijuana before arriving at the party. He testified that all three defendants were staggering and very intoxicated.

Dunsdon additionally testified that he was born in Bingham, Utah, but had lived most of his life in Pleasant Grove, Utah; that he had been in military service and was employed as a journeyman painter; that he was divorced and had five children; that he was not acquainted with Marvell or Codianna before the evening of April 8th; that he did not know the victim but told a girlfriend he was going to beat up someone; that Marvell told Dunsdon (1) where the victim lived, and (2) that a weapon should be picked up as the victim had a shotgun and had threatened to shoot Marvell with it previously; that Codianna's .22 caliber rifle was assembled and loaded by Codianna, then taken and retained by Marvell; that Dunsdon identified himself to the victim after arriving at his residence as "Cowboy"; that after the victim was shot in the driveway, Dunsdon picked him up and got blood on his pants; that he was frightened and called for someone to help him put the victim in the truck; after arrival in a canyon, all three defendants dragged the victim off the road; that though he struck the victim once at his residence with brass knuckles, he believed the contusions were caused from dragging the victim; that he believed Marvell shot the victim though he did not attempt to prevent Marvell from doing so; and that Dunsdon had trouble driving the truck, during which he heard the victim moan in the back of the truck.

Also at the penalty hearing, the police chief of Pleasant Grove, Utah, testified that he had known Dunsdon for twenty-nine years and that he had a good reputation as a law abiding citizen.

.

Law enforcement officers called by the State testified that the defendants did not appear to be under the influence of alcohol or drugs and they appeared to know "what they were doing" both at the time they were apprehended in the truck and shortly thereafter at the police station.

Witnesses were called by defendants concerning the propriety, history, and effects of capital punishment and generally testified adversely concerning the imposition of the death penalty.

The District Judge, as noted ante, without a jury, decided in this phase of the trial that each of the defendants should suffer the imposition of the death penalty for this offense. A reading of the transcript of the Judge's comments demonstrates that he made a careful, deliberate review and analysis of the evidence in this case to determine whether life imprisonment or death should be the penalty for the defendants and—in essence—concluded that the total aggravating circumstances outweighed the total mitigating circumstances. See *State v. Pierre*, Utah, 572 P.2d 1338 (1977) concerning this standard of proof.

■ Defendants argue that Utah's statutes, specifically Sections 76–3–206 and 76–3–207, are unconstitutional as they permit the imposition of the death penalty in certain instances. They claim that these statutes are infirm as they do not provide for automatic appeal, do not require specific written findings when the death penalty is imposed, do not adequately establish standards of proof concerning aggravating and mitigating circumstances (Dunsdon claiming that proof beyond a reasonable doubt of the absence of mitigating circumstances is required), do not eliminate arbitrariness and caprice, and do not serve to establish any compelling state interest in the death penalty. They conclude that the imposition of death by the State is cruel and unusual punishment. These matters were extensively covered in *Pierre*, supra, to which the reader is referred, and are rejected here for the same reasons given therein.

Defendants Marvell and Codianna contend that reversible error was committed when Defendant Dunsdon's attorneys and the State's attorney conferred with the Court, Defendant Dunsdon being present, in chambers without notice to and in the absence of Marvell, Codianna, and their attorneys.

On the first day of trial, viz., August 4, 1975, the Court took a noon recess. During proceedings prior thereto on that day, all defendants and their attorneys were present and the members of the jury panel were questioned but the trial jury had not yet been selected as questioning of these members had not concluded.

In this hearing in chambers, the attorney for the State moved to sever Defendant Dunsdon from the trial for the purpose of having him testify for the State against the co-defendants and later plead guilty to second degree ·murder. After discussion, the motion was denied by the District Judge as untimely and the trial proceeded with all three defendants.

Although Marvell and Codianna and their counsel were not informed before the hearing on this motion to sever, the District Judge immediately after this hearing reconvened Court with the jury panel, defendants, and all counsel present. He apologized for being late and commented that "some of counsel were on consultation on a matter with the Court pertaining to this case."

The State's attorney, as an explanation for the State's motion made in chambers, asserted: "The State is quite confident in this case . . . perhaps Mr. Dunsdon may have some mitigating evidence to put on that may not convict him of the full charge (a capital felony). And the State feels that the . . . five to life sentence is a fair exchange for a more reinforced case." Defendant Dunsdon made no comments at this hearing though his two attorneys concurred in the State's motion. The District Judge in denying the motion said: "I am saying . . . I don't think your motion is timely made. I can see that it would result in delay. And possibly in injustice . . . ."

Defendants Marvell and Codianna cite authorities from this State[3] and other jurisdictions as a compelling basis for their contention of prejudicial error.

They specifically claim that they should have been able to cross examine Dunsdon and "influence the judge vis-a-vis the Dunsdon testimony". And though as noted, ante, Dunsdon said nothing during the hearing in chambers, this claim, they contend, vitalizes the larger contention that they were deprived of making an informed choice concerning their determination to have the District Judge—not the jury—decide their fates at the penalty phase of the trial.

■ Utah's Constitution as referenced in note 3 states:

In criminal prosecutions the accused shall have the right to appear and defend in person and by counsel . . .

And the substance of this provision, they continue to argue, along with other similar laws and authorities—here and elsewhere—compels an interpretation that an accused's entitlement to his and his attorney's presence at a critical stage of criminal proceedings is an inviolate right, the denial of which must eventuate in reversal as injury to the accused is conclusively presumed.[4]

■ We believe that error was made in holding this hearing in the absence of these two defendants and their counsel. We do not believe, however, that prejudicial error occurred. First, the trial jury had not been selected at the time of the hearing in chambers and second, the District Judge immediately after the hearing notified these defendants and their counsel, without objection, that he had consulted out of their presence, with "some counsel". But of far more importance than these two reasons, the transcript of that hearing demonstrates, beyond a reasonable doubt, that discussions between the Court and counsel did not contribute to the District Judge's decision at the penalty phase to impose the death penalty on the defendants.[5] These discussions were centered on Dunsdon's possibly being less culpable. The comments by the State's and Dunsdon's attorneys were most generalized on this point—indeed, in no way revealed any *specificities* or sensitive areas of the defendants' roles or participations in the crime. The District Judge's comments at the hearing in chambers and his detailed comments at the sentencing proceeding where he reviewed the evidence presented at both the guilt and penalty phase of the trial, as well as his reasons for sentencing the defendants to death—including Dunsdon, significantly—show, beyond a reasonable doubt, that he was not influenced by the hearing in chambers. And we therefore do not perceive that the absence of Codianna and Marvell, as well as their attorneys, from the hearing in chambers, in the context of this case, involved a constitutional right ". . . so basic to a fair trial that (its) infraction can never be treated as harmless error . . . ." *Chapman*, ante, at p. 23.

■ Defendant Dunsdon argues that the Court erred in denying his motion for a mistrial on the ground of prosecutorial misconduct in exhibiting to the jury an inflammatory and prejudicial photograph which had previously been excluded by the Court. The photograph in question was an eight by ten inch full color photograph of the body of the victim showing multiple abrasions and gunshot wounds. The District Judge excluded this photograph because he found it to be gruesome and saw no reason for admitting it inasmuch as there was a black and white copy of the same photograph.

Defendant Dunsdon charges that the State's attorney included the color photo-

3. See Art. 1, Sec. 12, Constitution of Utah; U.C.A., 1953, Secs. 77–1–8(1) and 77–27–3; *State v. Myers*, 29 Utah 2d 254, 508 P.2d 41 (1973); and *State v. Aikers*, 87 Utah 507, 51 P.2d 1052 (1935).

4. Defendants cite, inter alia, *People v. Medcoff*, 344 Mich. 108, 73 N.W.2d 537 (1955); *State v.*

*Carver*, 94 Idaho 677, 496 P.2d 676 (1972); and *Aikers*, at note 3.

5. See *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); and *State v. Scandrett*, 24 Utah 2d 202, 468 P.2d 639 (1970).

graph with others for identification by a witness and handled it in such a way that it could be seen by the jury. In so doing, defendant argues, the photograph so prejudiced and inflamed the jury that there is a reasonable probability that the defendant did not have a fair trial.[6]

Defendants Codianna and Marvell do not argue this point on appeal, but brought a motion for a new trial on this ground before the District Court. At the hearing on their motion, the Court said:

Now the question arose as to whether or not the jurors saw the colored picture. Now mind you, the colored picture had not been identified. The jury had never seen it. They weren't looking for it . . The back of the pictures were facing the jury. And then there was a question of whether there was a flash, just for a moment, a momentary flash. Well I . . . took the view at that time, and I still am in serious doubt that the jurors saw that at all . . . And if they had seen it . . . I cannot see how that could be held to be prejudicial to . . the defendants . . . . .

We are not persuaded that we should substitute our judgment for that of the District Judge, who was present and observed the incident,[7] and who did not believe that the jury saw the photograph, and therefore, we reject defendants' argument.

■ Defendants argue that the evidence does not support the verdict of first degree murder. They assert that the only aggravating factor enumerated in Section 76–5–202, ante, on which the jury could have based its verdict was that the homicide was committed while the actor was engaged in a kidnapping, and that any kidnapping of the victim here was only incidental to the crime. Section 76–5–202 requires the establishment of only one of the aggravating circumstances in order to support a verdict of first degree murder. Utah's kidnapping statute, Section 76–5–301, et seq., defines kidnapping as any detention or restraint of a person against the will of that person. The defendants do not deny, and the evidence establishes overwhelmingly, that this victim was detained, as well as transported, against his will and the jury could reasonably have found, beyond a reasonable doubt as it did, that a kidnapping had occurred.

Defendant Marvell argues that the Court erred in sentencing him to death when the only evidence of his participation in the crime was the statement of Dunsdon during the penalty phase of the trial, who testified that it was Marvell who shot and killed the victim. Defendant states that this statement was uncorroborated and came from an accomplice to the crime. He argues therefore that the statement should have carried no weight with the Court in sentencing Marvell to death, when without corroboration, it would not have sustained his conviction.[8] This argument is meritless. Marvell was convicted in the guilt phase by overwhelming evidence, without Dunsdon's testimony; and no legal authorities have been cited to us—and we know of none—which would sustain Marvell's contention or reasoning.

Defendants contend that prejudicial error was made by the Court in the voir dire of the prospective jurors, in the following particulars: that the District Judge (1) erroneously informed them that the jury would determine the punishment at the penalty phase of the trial, (2) in his explanation to them assumed the guilt of the defendants, and (3) erred in the voir dire concerning the death penalty.

As to (1) above, defendants contend that Sec. 76–3–207 was not followed. In relevant part this section states:

(1) When a defendant has been found guilty of a capital felony, there shall be further proceedings before the court or

---

**6.** See *State v. Sullivan*, 6 Utah 2d 110, 307 P.2d 212, 216 (1957); *State v. Hodges*, 30 Utah 2d 367, 517 P.2d 1322, 1324 (1974); and *State v. Poe*, 21 Utah 2d 113, 441 P.2d 512 (1968).

**7.** See *State v. Hodges, supra.*

**8.** U.C.A., 1953, Sec. 77–31–18 states: "A conviction shall not be had on the testimony of an accomplice, unless he is corroborated by other evidence . . . .".

jury on the issue of penalty. The proceedings shall be conducted before the court or jury which found the defendant guilty, provided the defendant may waive hearing before the jury, in which event the hearing shall be before the court

. . . .

Defendants assert that the District Judge informed the prospective jurors that in the event of a verdict of guilty of a capital felony that the jury would determine the issue of penalty but failed to inform these jurors that the Court would do so if the defendants waived the jury.

 This section does not require that prospective jurors be informed of the possibility of the Court's determining this issue and we hold no error occurred in this regard. We note that no objection was made to this claimed error, which our law generally requires in order for a matter to be considered on appellate review.[9] But because these cases involve capital offenses, we have considered defendants' contention.[10] We also note that the District Judge, in his instruction no. 7, informed the trial jury at the conclusion of the guilt phase that that jury, or the Court, if the jury was waived, would determine the penalty.

 As to (2) above, defendants assert error in the voir dire occurred when the Judge stated, among other remarks, ". . . let's make it apply to this case and say these defendants (sic) guilty of first degree murder . . .". They contend such a statement assumed their guilt. We think not when it is considered in context. A reading of the transcript clearly demonstrates that the Judge was pursuing mat-

ters raised in *Witherspoon v. United States*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).[11] And that pursuit, in the environs of the other comments made in his examination of the prospective jurors did not assume the guilt of defendants but revealed that he was attempting to determine whether these jurors would refuse to find the defendants guilty in *a proper case* because of their feelings concerning capital punishment. His allegedly erroneous remark was intended to clarify the matter under consideration.[12]

 As to (3) above that the Court erred in the voir dire concerning the death penalty—and specifically that he erred in excusing two prospective jurors for cause, both women, and not excusing another one, a man, we hold that no error was committed. Again, the transcript discloses that the two women had more than general objections to the death penalty—indeed they could not vote for the death penalty (if called upon to participate in the sentencing phase) under any circumstances. The Court's excusing these women does not offend *Witherspoon*; rather it is fully within its perimeters. As to the claim that venireman Christensen should have been excused because he was death oriented, we discern no error. The thrust and substance of his responses to questioning by the Court was that he could vote for death if the evidence warranted it.

 We believe from our review of the voir dire that the District Judge did not instill in the prospective jurors any impression that they had to be death oriented or favor capital punishment as a personal be-

---

9. *State v. Peterson*, 121 Utah 229, 240 P.2d 504, 507 (1952).

10. See *State v. Pierre*, ante, and authorities cited therein.

11. The United States Supreme Court stated in *Witherspoon*: "Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced *general objections* to the death penalty or expressed conscientious or religious scruples against its infliction." 391

U.S. at 522, 88 S.Ct. at 1777. (Emphasis in the original text); and in *State v. Redford*, 27 Utah 2d 379, 496 P.2d 884 (1972), this Court in interpreting the matter condemned in *Witherspoon* stated: "Challenges were exercised under the Illinois statute to all who had scruples against the death penalty—regardless of whether or not they could impose it. This is what the *Witherspoon* case condemned." 496 P.2d at 887.

12. *State v. Polson*, 81 Idaho 147, 339 P.2d 510, 519 (1959).

lief or commitment. A comment to one of these jurors illustrates the tone of the voir dire when he said:

> Well, I know, but a lot of us don't like the death penalty but if that is the law, and of course, you don't have to agree on the death penalty; you have two alternatives.

■■■■ Defendant Dunsdon claims reversible error because the Court refused to grant his motion to sever,[13] which was based on allegations that the interests of the other two defendants were adverse and evidence against them would be highly prejudicial to him. Also, he claims error in denying the State's motion to sever him from this trial. We hold the Court did not abuse its discretion in either instance. As to the State's motion, the reasons for denying it were discussed, ante, with respect to Defendants Codianna and Marvell and control here with respect to Defendant Dunsdon. As to his motion to sever, no specific allegations were made in the affidavit accompanying said motion that would be illuminative of hostility, adverseness, or antagonisms of defenses between him and the co-defendants. Therefore, *State v. Gaxiola*, 550 P.2d 1298 (Utah. 1976) would generally be controlling, which holds that a motion for severance must be based upon the facts which the trial court had before it at the time of that motion. But, again, because these are capital cases, we have reviewed this contention and our review, independently of *Gaxiola*, shows no prejudice. No defendant personally presented evidence at the guilt phase. And at the penalty phase, no defendant asserted non-participation in the commission of the crime or claimed coercion by the other. At most, during the penalty phase, testimony was given by all defendants probative, they contend, of mitigation. There was no abuse of discretion by denial of Dunsdon's motion as it did not sacrifice his ". . . right to a fundamentally fair trial . . .". *State v. Pierre*, ante.

Some defendants claim that the evidence at the guilt phase did not support the verdict and at the penalty phase, the evidence did not support the death penalty; and they particularly urge upon us error as the Judge did not at the penalty phase give any or sufficient weight to drug and beer consumption by them, their minimal involvement in the crime, or their prior histories. Also, it is contended that error was made below as the brutality and ruthlessness of the crime "which so influenced the trial judge" are not proper or statutorily specified aggravating factors. Of course, we have considered these points as applicable to all defendants, whether raised or argued by them, as we have attempted to do throughout the review by this Court of all matters (unless a matter raised by a defendant or considered sua sponte by us is clearly applicable to one or more defendants but not all of them).

■■■■ We reject arguments made in the preceding paragraph as unmeritorious. The evidence sustains a verdict of guilt beyond a reasonable doubt of murder in the first degree by the jury. The determination in the penalty phase by the District Judge is sustained by the evidence and shows that the burden on the State, announced in *State v. Pierre*, ante, that the total aggravating circumstances must outweigh the total mitigating circumstances has been met with respect to each defendant. Further the argument that Sec. 76–3–207 disallows consideration of brutality and ruthlessness, as aggravating factors, is without merit. That section refers to Sec. 76–5–202 which lists, specifically, certain aggravating factors but Sec. 76–3–207 also states that in the penalty phase ". . . evidence may be presented as to any matter the court deems relevant to sentence, including but not limited to the nature and circumstances of the crime . . . and any other facts in aggravation . . . of the penalty. . . ." We hold that it

13. U.C.A., 1953, Sec. 77–31–6 states: "When two or more defendants are jointly charged with any offense, whether felony or misdemeanor, they shall be tried jointly, unless the court in its discretion on the motion of the prosecuting attorney or any defendant orders separate trials. . . ."

was relevant for the District Judge to consider the ruthlessness and brutality of this murder. *State v. Pierre*, ante.

We conclude by holding there is no basis in this record for reversal, remanding for a new trial, or remanding for purposes of vacating the death penalty and sentencing any defendant to life imprisonment pursuant to Sec. 76–3–207(4), on the ground that the sentence of death is disproportionate and excessive in relation to the offense for which these defendants were convicted and their individual and collective involvement therein. The circumstances of the offenses and defendants' participation in them have been related in some considerable detail, ante. Those circumstances and each defendant's participation created a tragedy of extreme and shocking ruthlessness and brutality.

It is the crushing excess of violent acts by the defendants against the victim, so senselessly wrenched from life, that most vividly characterizes this murder.

All claimed errors being without merit or unprejudicial, we affirm and remand for further proceedings consistent with this opinion.

HALL, J., concurs.

ELLETT, C. J., concurs in result and also concurs in the concurring opinion of CROCKETT, J.

CROCKETT, Justice (concurring, but with reservation; and with comments):

Regrettably, I am unable to agree with the statement that there was error in the discussion in chambers of the proposal that the trial of Dunsdon be severed. I do not regard such a discussion between the court and counsel as to how a trial shall proceed as part of the trial itself. Furthermore, it was certainly no error as to Dunsdon; and it was he who was to be affected thereby if the request had been granted. The trial court's rejection of the suggestion could not

be otherwise than favorable to the other defendants.

Nor do I see that there was any error with respect to the picture. If a picture, or other evidence, is a fair representation of facts material to the proof of the crime charged, it is admissible; and the fact that it may be gruesome or even revolting to the sensibilities, or inflammatory of emotions, does not make it inadmissible.[1] As pointed out in *State v. Poe*, footnote 6, main opinion, it is when there has been some distortion which has the baneful effect that error and prejudice arises. It does not accord with my idea of seeking truth and doing justice to permit one involved in a horrible crime to permit him to assert that it is so horrendous that the jury, searching for the truth, should not be permitted to see what the real facts are. In his concern to guard against any possible prejudice, the conscientious trial judge was acting in an abundance of caution. But in my opinion the picture was competent evidence and certainly no error prejudicial to the defendant occurred, whether the jurors saw it or not.

In regard to the matter of the death penalty, about which there has been so much controversy and concern I make these brief comments. It is my firm conviction that that question is not within either the prerogative or the responsibility of the judiciary. The defining of what acts shall constitute crime and the punishment therefor has always been regarded as a function of the legislative branch of government.[2] When a punishment for a given crime has existed for generations without any legislative change, and the judiciary presumes to initiate any such definite and dramatic change as to abolish the penalty entirely, it seems to me uncontestably clear that this constitutes an intrusion into the legislative field. I likewise see no escape from the conclusion that to do so is to yield to the temptation to exercise an arrogance of power under an assumption that it is be-

1. *State v. Woods*, 62 Utah 397, 220 P.2d 215 (1923); *State v. Renzo*, 21 Utah 2d 205, 443 P.2d 392 (1968); *State v. Johnson*, 25 Utah 2d . 46, 475 P.2d 543 (1970).

2. 21 Am.Jur.2d, Criminal Law, Sec. 590, p. 551, and Sec. 577, p. 542; 24B C.J.S. Criminal Law, Sec. 1975.

yond control because the judicial power is the judge of its own limitations.

It is my observation that history is replete with examples which demonstrate that where uncontrolled power of any nature continues to arrogate more and more power to itself, that power is eventually destroyed. I admire and subscribe to the wisdom of Lord Macaulay who said: "Among the highest proofs of virtue is the possession of power without abusing it." I yield to no one in respect, even reverence, for the judicial system in our United States of America, and the broad spectrum of personal liberties we have enjoyed in our well-balanced system of government, both state and national. It is my most ardent hope that the judiciary, which has the awesome power and responsibility to judge the extent of its own powers as well as of the other branches of government, will always exercise restraint to the end that the balance be kept true and the system will continue to endure.

MAUGHAN, Justice (concurring and dissenting):

For the reasons stated in my concurring and dissenting opinion in *State of Utah v. Pierre,* Utah, 572 P.2d 1338 (1977), I concur and dissent in this matter.