Gypsy Allen CODIANNA, Petitioner
and Appellant,

v.

Lawrence MORRIS, Warden, Utah State
Prison, Defendant and Respondent.

No. 17203.

Supreme Court of Utah.

March 1, 1983.

Ginger L. Fletcher, Salt Lake City, Timothy K. Ford, Seattle, Wash., for petitioner and appellant.

David L. Wilkinson, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, for defendant and respondent.

OAKS, Justice:

Petitioner Gypsy Allen Codianna and two codefendants were convicted of murder in the first degree in 1975. Their convictions were affirmed on appeal. In this appeal from the denial of postconviction relief by habeas corpus, petitioner urges (1) that the district court erred in refusing to hear evidence on various alleged errors at his trial (by granting partial summary judgment), and (2) that on the basis of evidence heard by the district court it should have set aside his conviction on the grounds (a) that the state withheld exculpatory evidence and (b) that he was denied the effective assistance of counsel at his trial.

The facts giving rise to this case are set forth in detail in *State v. Codianna,* Utah, 573 P.2d 343 (1977) (*Codianna I*), cert. denied, 439 U.S. 882, 99 S.Ct. 219, 58 L.Ed.2d 194 (1978). Briefly, the murdered man, Michael Hogan, answered a knock at the door of his home late one night. Three men entered, struggled with Hogan, and dragged him outside, where three gunshots were heard and where "puddles" of blood were later observed. Three men (one resembling Craig Marvell, a codefendant) then climbed into a pickup. Codianna, Marvell, and Irvin Dunsdon (the third codefendant) were apprehended in this pickup about a half hour later. By tracing its tracks, law enforcement officers located Hogan's body in a canyon. Thirteen bullets were removed from his body, which also bore fifty abrasions and contusions.

After a joint trial, Codianna, Marvell, and Dunsdon were convicted of first degree murder in connection with the commission or attempted commission of burglary or kidnapping. U.C.A., 1953, § 76-5-202(1)(d). The three defendants pursued a joint appeal, assigning eleven errors for reversal. In affirming the conviction, this Court described the murder as "a tragedy of extreme and shocking ruthlessness and brutality." *Codianna I,* 573 P.2d at 353.

Thereafter, on December 12, 1978, Codianna filed a petition for habeas corpus, which the district court summarily dismissed three days later. Codianna appealed, alleging sixteen constitutional violations. During the pendency of that appeal, defense counsel discovered certain depositions and physical evidence known to the prosecution prior to the trial. Based on that evidence, Codianna filed an original petition for habeas corpus in this Court. We consolidated the appeal and the petition and remanded to the district court for "a determination of facts, as to whether there has been any withholding of material evidence from which there is any reasonable likelihood that there may have been a different result, either as to the verdict rendered, or upon the sentence imposed." *Codianna v. Morris,* Utah, 594 P.2d 874, 877 (1979) (*Codianna II*).

On remand, Codianna's case was joined with similar proceedings involving his codefendants. Prior to a hearing, the district court granted summary judgment as to all issues raised in the petitions except two. After a hearing, the district court ruled as to those questions: (1) that petitioners were not deprived of effective assistance of counsel, and (2) that the prosecution's failure to disclose exculpatory evidence (certain witness statements) in its possession did not invalidate petitioners' convictions, but did taint the penalty phase. The court therefore vacated the sentence of death and ordered a sentence of life imprisonment for all three defendants.

Petitioner Codianna appeals the district court's refusal to vacate his conviction. His codefendants have not appealed. There is no appeal from the order reducing the death sentence to life imprisonment. We affirm the district court's order.

## I. THE PARTIAL SUMMARY JUDGMENT

Petitioner contends that the district court erred in granting the state's motion for summary judgment on four issues, thereby effectively denying him due process of law.

First, *voir dire* was insufficient, and the judge erred in failing to insulate the jury from pretrial publicity. Although the judge conducted the examination of prospective jurors as directed by the statute then in effect, U.C.A., 1953, § 77–28–1 (repealed 1980), defense counsel were permitted to question the veniremen through the judge. Petitioner contends that in light of the publicity preceding his trial, the judge erred both in failing to conduct a more searching examination of the prospective jurors and in not forbidding them to read or listen to news reports about the trial. The state responds that a failure to make searching inquiry is not error when there is no allegation that the pretrial publicity was prejudicial, that the judge solicited questions from petitioner's counsel and asked all questions submitted (with one exception that was covered in the jury instructions), that petitioner failed to preserve the issue by timely objection, and, in any case, that this Court considered the issue of *voir dire* in *Codianna I.*

Second, the court failed to require an individual determination of guilt, since it instructed the jury that it was to convict if it found that "the defendants Gypsy Allen Codianna, Irvin Paul Dunsdon, and Craig Derrickson Marvell, caused the death of Michael Hogan" under circumstances amounting to first degree murder. The state responds that petitioner's counsel failed to request an instruction specifically requiring an individual determination of petitioner's guilt, and that, in any case, the jury instructions taken as a whole made clear the necessity of an individual determination of guilt.

Third, the court failed to require the jury to reach unanimous agreement on whether the murder was committed in connection with a kidnapping or a burglary. The state responds that the jury did not need to agree

on which underlying felony supported the murder so long as each juror agreed that one of them was committed or attempted, that there was ample evidence of both a burglary and a kidnapping, and that this Court held in *Codianna I* that "the evidence establishes overwhelmingly" a kidnapping. 573 P.2d at 350.

Fourth, the court failed to instruct the jury on the definition of second degree murder that most clearly applied to the facts of petitioner's case. The state responds that in view of the lack of evidence suggesting that petitioner was innocent of first degree murder but guilty of second degree murder, there was no rational basis for the omitted instruction and petitioner suffered no prejudice from its omission. The state also relied on petitioner's failure to raise this objection at trial.

We cannot reach the merits of any of these four issues without first addressing the threshold question of whether they may properly be raised by habeas corpus in this case.

 The writ of habeas corpus has performed a vital function in Anglo-American law as a protection against illegal detention. But this Court has often reiterated that habeas corpus is not a substitute for and cannot be used to perform the function of regular appellate review. As we said in *Boggess v. Morris,* Utah, 635 P.2d 39, 41 (1981),

> The ends of justice demand that a convicted defendant have an opportunity to appeal in timely fashion, but once the appellate process has concluded, society's interest in the effectiveness and integrity of the criminal justice system requires a finality of judgment that should severely limit repetitive appeals and collateral attacks.

It is therefore well settled in this state that allegations of error that could have been but were not raised on appeal from a criminal conviction cannot be raised by habeas corpus or postconviction review, except in unusual circumstances.

A much-quoted statement of the type of errors that are and are not cognizable by habeas corpus is the following from this Court's unanimous opinion in *Brown v. Turner,* 21 Utah 2d 96, 98–99, 440 P.2d 968, 969 (1968) (Crockett, C.J.):

> [Habeas corpus] is an extraordinary remedy which is properly invocable only when the court had no jurisdiction over the person or the offense, or where the requirements of law have been so disregarded that the party is substantially and effectively denied due process of law, or where some such fact is shown that it would be unconscionable not to re-examine the conviction. *If the contention of error is something which is known or should be known to the party at the time the judgment was entered, it must be reviewed in. the manner and within the time permitted by regular prescribed procedure, or the judgment becomes final and is not subject to further attack, except in some such unusual circumstance as we have mentioned above.* Were it otherwise, the regular rules of procedure governing appeals and the limitations of time specified therein would be rendered impotent. [Emphasis added.]

Among the numerous cases quoting and applying the emphasized standard is *Hafen v. Morris,* Utah, 632 P.2d 875, 876 (1981), where the Court held that a prisoner's contention that his counsel failed to challenge a particular juror could not be raised by habeas corpus because the petitioner had failed to use his "adequate opportunity" to raise that contention at his trial or on direct appeal from his conviction.

█ All four of the issues foreclosed by the partial summary judgment were issues that were known or should have been known to petitioner and his counsel at the time of his conviction. Consequently, those issues are foreclosed from consideration on habeas corpus and the partial summary judgment was proper under the test in *Brown v. Turner, supra,* unless there was some "unusual circumstance" of the type specified there.

As justification for failing to raise these four issues on direct appeal and in an attempt to establish "unusual circumstances," petitioner cites his counsel's "inexperience" and "unfamiliarity with the areas of law that controlled these aspects of the case." If counsel's deficiencies were sufficiently grievous to deprive petitioner of the effective assistance of counsel, they constituted a violation of due process that is clearly reviewable on appeal or by postconviction review. This subject is discussed in Part III. But these deficiencies fall short of unconstitutional stature and do not constitute the "unusual circumstances" that allow alleged errors that could have been raised at trial or on appeal to bypass the normal rule of finality and qualify for review by habeas corpus.[1] To permit the inevitable instances of attorney oversight or ignorance to qualify for the "unusual circumstances" exception would allow that exception to swallow up the rule, thereby transforming habeas corpus from an extraordinary remedy into an alternative appeal mechanism in contravention of the finality of criminal judgments that is the settled policy of this state.

These four issues not being cognizable in a habeas corpus proceeding, the district court properly granted the state's motion for partial summary judgment.

## II. SUPPRESSION OF EVIDENCE

After receiving evidence, the district court concluded that the prosecution had

---

1. *Cf. Washington v. Estelle,* 648 F.2d 276, 278 (5th Cir.1981), *cert. denied,* 454 U.S. 899, 102 S.Ct. 402, 70 L.Ed.2d 216 (1981); *Indiviglio v. United States,* 612 F.2d 624, 631 (2d Cir.1979), *cert. denied,* 445 U.S. 933, 100 S.Ct. 1326, 63 L.Ed.2d 768 (1980), holding that ineffective counsel short of a Sixth Amendment violation does not satisfy the analogous requirement of "cause" established for federal habeas corpus review in *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2947, 53 L.Ed.2d 594 (1977), and *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). Such a rule avoids the factfinding and second-guessing necessary to distinguish between counsel's permissible tactical decisions and his impermissible errors or inadvertence. *Compare,* to the opposite effect, decisions like *Runnels v. Hess,* 653 F.2d 1359 (10th Cir.1981), and *Garrison v. McCarthy,* 653 F.2d 374 (9th Cir.1981).

not withheld material exculpatory evidence, that there was overwhelming evidence of guilt presented at the guilt phase of trial, and that petitioner and his codefendants were therefore not deprived of any constitutional rights by reason of the prosecution's failure to reveal the existence or substance of certain witness statements to the defense. Petitioner challenges that ruling.

This issue is proper for consideration on habeas corpus. The requirement of unusual circumstances is met because the evidence withheld—consisting of eleven witness depositions, four written witness statements, and the unrecorded statement of one witness (Monica Bell) to a prosecution investigator—was unknown to petitioner until approximately one year after this Court's decision on his direct appeal, and the basis alleged for relief—if established by the evidence—would clearly constitute a violation of due process. *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Pyle v. Kansas,* 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed.2d 214 (1942).

On the merits, under the holdings in the cases cited above, there is no single standard for determining whether the prosecution's withholding of exculpatory evidence violates due process. A different standard applies in each of three separate circumstances. The first circumstance is where the undisclosed evidence shows that the prosecution's case included perjured testimony, and the prosecutor knew or should have known that fact. There the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs,* 427 U.S. at 103, 96 S.Ct. at 2397; *Pyle v. Kansas, supra.* This standard does not apply in this case because petitioner has not demonstrated any material conflict between the prosecution's testimony and the undisclosed evidence.

The second circumstance is where the defense makes a pretrial request for specific evidence which would tend to exculpate the defendant or reduce the penalty. In that

circumstance, the Court said, "it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." *United States v. Agurs,* 427 U.S. at 106, 96 S.Ct. at 2398. The failure to make any response whatever would be a violation of due process. *Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196. However, we have held that where the evidence was destroyed routinely prior to the request, there was no basis for reversal where the evidence was not "vital" to the issue of defendant's guilt or innocence. *State v. Nebeker,* Utah, 657 P.2d 1359 (1983); *State v. Stewart,* Utah, 544 P.2d 477 (1975). This second circumstance does not apply in this case because, as the district court specifically found, "[p]etitioner's counsel made no general or specific request for information from the county attorney."

Petitioner's claim of denial of due process by failing to volunteer exculpatory evidence falls solely within the third circumstance, explained in *United States v. Agurs* as follows:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

427 U.S. at 112–13, 96 S.Ct. at 2401–2402. A prosecutor violates due process under this third circumstance if he fails to reveal voluntarily evidence which, viewed in the context of the entire record, creates a reasonable doubt about defendant's guilt. There is no violation of due process if the evidence demonstrates only a "mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial . . . ." *Id.* at 109–10, 96 S.Ct. at 2400.

Under this standard, we must examine whether the eleven depositions, the four written witness statements, and the unrecorded witness statement that the prosecution did not reveal voluntarily create a reasonable doubt of petitioner's guilt when viewed in the context of the entire trial record. If they do, the trial was constitutionally flawed and petitioner's conviction must be vacated. If they do not, petitioner's conviction cannot be vacated on this ground.

1. Petitioner claims that, as to him, these undisclosed witness statements were clearly exculpatory because they suggest that his codefendants actually committed the murder. First, Heath, the victim's neighbor, made a statement that the person resembling Marvell was holding "what could have been a gun." In another statement, a friend of the victim stated that she had once seen Marvell put a gun to the victim's head and threaten to kill him, and that Dunsdon's girlfriend had told her that Dunsdon said, "Craig [Marvell] did it all." [2] Petitioner also points to the prosecutor's statement, made in an in camera plea-bargaining conference with Dunsdon's attorney and the court, that Dunsdon was "lesser involved." Lastly, according to testimony by a prosecution investigator in the hearing below, the prosecution had learned that

Dunsdon gave some brass knuckles to his girlfriend at the jail immediately after his arrest. Petitioner contends that this evidence, which was unknown to his counsel, "tended to show that every injury inflicted on Michael Hogan was attributable to someone other than Codianna."

Petitioner has failed to show that this evidence creates a reasonable doubt of his guilt when it is viewed in the context of the entire record. Heath's vague statement about who held a gun at about the time three shots were fired is inconclusive of individual guilt when there were thirteen bullets in the victim's body.[3] Marvell's threats on the victim's life do not show that petitioner did not intentionally aid in the murder. Dunsdon's self-serving statement that "Craig did it all" is not weighty, especially in view of the relating witness's own disbelief of the explanation. Finally, Dunsdon's possession of the brass knuckles the night of the murder does not establish that only he used them, that petitioner did not use them, or that no other instrumentality could have been used to inflict some or all of the fifty abrasions and contusions on the victim's body.[4]

Furthermore, even assuming *arguendo* that all the shots were fired by Marvell and that all the blows were struck by Dunsdon,

2. The relevant passage in her statement reads:
Q. Have you talked to Monica since this time?
A. Yeh, I talk to her about every day.
Q. She has had some conversation with Cowboy [Dunsdon], has she not?
A. I think so, . . . well, yeh, she told me he said he didn't do it—that Craig did it all, but I told her that was bullshit.
 \* \* \* \* \* \*
Q. Did Monica say why Cowboy or the Gypsy went along with it if they were not involved?
A. She didn't. Gypsy didn't say that he wasn't involved, just the Cowboy was telling her not to leave him because he didn't do it, and stuff like that.

3. In addition, petitioner's counsel elicited testimony at the preliminary hearing that Heath did not see a gun. *See* note 8, *infra*.

4. In addition, we can hardly conclude that the existence of the brass knuckles was suppressed, since the prosecution elicited it in

open court, from Dunsdon himself, in the penalty phase of the trial. Cross-examination by the prosecution:
Q. Mr. Dunsdon, you heard testimony about the fifty contusions Mr. Hogan received. Now you testified as to the gunshots that you heard, and you testified as to your striking Mr. Hogan when he came out of the house. Did you have anything in your hand that you struck him with?
A. Yes, sir I did.
Q. What did you strike him with?
A. A pair of brass knuckles.
Q. And what happened to those brass knuckles?
A. I got them out of jail before I was frisked. Before I was shook down.
Q. Did you pass them off to somebody else in the jail house?
A. Yes.
Q. Was that Monica Bell that you gave the brass knuckles to?
A. Yes it was.

the undisclosed evidence or leads still fail to raise a reasonable doubt of petitioner's guilt of the crime. The jury at petitioner's trial was properly instructed on the principle that "[e]very person ... who ... encourages, or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable as a party for such conduct." U.C.A., 1953, § 76–2–202. In light of this instruction, even evidence establishing that petitioner's codefendants did the actual killing would not necessarily exculpate petitioner. *People v. Brawley*, 1 Cal.3d 277, 461 P.2d 361, 82 Cal.Rptr. 161 (1969), *cert. denied sub nom Baker v. California*, 400 U.S. 993, 91 S.Ct. 462, 27 L.Ed.2d 441 (1971). We therefore find no violation of due process in the prosecution's failure to disclose the witness statements summarized above.

2. Petitioner's second point concerns a defense of intoxication. He notes that several of the undisclosed depositions and at least one unrecorded witness statement (related by a prosecution investigator in the hearing below) indicated that there was drug and alcohol use at a party the three defendants attended shortly before the crime. Petitioner argues that this "drug and alcohol use was clearly relevant to the issue of premeditation and intent necessary for a conviction of first degree murder."[5] He further claims error in the prosecution's presenting the testimony of a police officer who testified at trial that he found no drugs or pills on petitioner at the time of the arrest.

Eight of the ten deponents represented in the eleven depositions described the party: one said he didn't know if there were drugs at the party; one admitted taking valium, but said he didn't see anyone else take any; two didn't see any drugs at the party; and four saw marijuana but no valium. (None of the four witness statements or the unrecorded statement described the party.) But the relevant questions are whether petitioner ingested any drugs at the party and, if so, whether he was intoxicated. Only two of the deponents were asked about petitioner's drug use at the party. Both stated that they did not see petitioner smoke marijuana or take pills that night. None of the deponents was asked about petitioner's drinking. We find no evidence in these depositions that creates a reasonable doubt on the issue of petitioner's guilt.[6]

■ In sum, the prosecution did not violate due process by withholding exculpatory evidence at petitioner's trial. The evidence that the prosecution did not volunteer is tangential or cumulative, and does not create a reasonable doubt of petitioner's guilt in the context of a record which presented, in the district court's words, "overwhelming evidence of guilt ...."

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner contends that his trial counsel's unfamiliarity with the facts and law of the case constituted a denial of his constitutional right to effective assistance of counsel.

Petitioner's trial counsel was a solo practitioner of approximately 3½-years' experience whose general practice had included a small number of criminal cases. Prior to representing petitioner, he had tried three felony cases, including a rape charge, and had been involved as subordinate co-counsel in a manslaughter case. Before trial, he petitioned the court to appoint co-counsel

---

**5.** U.C.A., 1953, § 76–2–306 states, "Voluntary intoxication shall not be a defense to a criminal charge unless such intoxication negates the existence of the mental state which is an element of the offense ...."

**6.** This conclusion is reinforced by the considerable evidence on the issue of intoxication in the penalty phase of the trial. Four law enforcement officers testified that petitioner did not appear to be intoxicated on the night of the murder. One testified that petitioner took his wallet from his own right rear pocket and removed several cards and a birth certificate from it without fumbling or dropping them while his hands were handcuffed behind his back.

On the other hand, one of the two deponents who stated that he did not see petitioner smoke marijuana or take pills at the party later testified for the defense in the penalty phase that he saw Codianna drink beer, smoke marijuana, and take valium.

due to the complexity and capital nature of the case, but the court denied his request.

This Court has previously held in a murder case involving appointed counsel that an accused "is entitled to the assistance of a competent member of the Bar, who shows a willingness to identify himself with the interests of the accused and present such defenses as are available under the law and consistent with the ethics of the profession." *State v. McNicol,* Utah, 554 P.2d 203, 204 (1976). *Accord, State v. Gray,* Utah, 601 P.2d 918 (1979); *Strong v. Turner,* 22 Utah 2d 294, 452 P.2d 323 (1969); *Alires v. Turner,* 22 Utah 2d 118, 449 P.2d 241 (1969). The *McNicol* test has a subjective element—"willingness to identify himself with the interests of the accused"—and an objective element—"competent member of the Bar." The objective element is measured both by general ability or experience and by performance in the defense of a particular case.[7] Both elements (willingness to identify with the accused, and competence) are essential to adequate representation. The *McNicol* test, which we reaffirm, includes all of the requirements the Court of Appeals for the Tenth Circuit identified in its recent redefinition of the constitutional requirements of effective assistance of counsel. After rejecting the "sham and mockery" test that had previously been applied in the Tenth and other Circuits, the court held: "The Sixth Amendment demands that defense counsel exercise the skill, judgment and diligence of a reasonably competent defense attorney." *Dyer v. Crisp,* 613 F.2d 275, 278 (10th Cir. 1980) (*en banc*).

Relying on *Dyer v. Crisp, supra,* and other authorities, our recent opinion in *State v. Malmrose,* Utah, 649 P.2d 56, 58 (1982), identifies the following considerations necessary to determine whether a conviction should be reversed or set aside on the basis of ineffective assistance of counsel: (1) The burden of establishing inadequate representation is on the defendant, "and proof of such must be a demonstrable reality and not a speculative matter." *State v. McNicol,* 554 P.2d at 204. (2) A lawyer's "legitimate exercise of judgment" in the choice of trial strategy or tactics that did not produce the anticipated result does not constitute ineffective assistance of counsel. *State v. McNicol,* 554 P.2d at 205. (3) It must appear that any deficiency in the performance of counsel was prejudicial. *State v. Forsyth,* Utah, 560 P.2d 337, 339 (1977); *Jaramillo v. Turner,* 24 Utah 2d 19, 22, 465 P.2d 343, 345 (1970). In this context, prejudice means that without counsel's error there was a "reasonable likelihood that there would have been a different result . . . ." *State v. Gray,* 601 P.2d at 920. Similarly, as we noted in *State v. Malmrose,* 649 P.2d at 58, "the failure of counsel to make motions or objections which would be futile if raised does not constitute ineffective assistance."

In this case, the district court found that petitioner's trial counsel "made numerous objections, did extensive cross-examination and fully participated in the trial . . . ." The court concluded that petitioner and his codefendants were represented by effective, competent legal counsel who "had a willingness to identify themselves with the interests of the defendants and present such defenses as were available to the defendants under the law and consistent with the ethics of the profession."

Focusing on the element of competence, petitioner assails the conclusion of the district court on four grounds: his trial counsel (1) failed to investigate potential defenses, (2) presented a legally invalid plea, (3) failed to object to publicity influences on the jury, and (4) failed to make the demands and objections necessary to insure that the jury was properly instructed. We will consider these in order.

1. Petitioner argues that if his counsel had actively investigated the facts

---

**7.** "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." American Bar Association, Model Rules of Professional Conduct, Rule 1.1 (Final Draft, 1982).

of the case, including a proper request for prosecution disclosure, he would have obtained evidence which could have supported two meritorious defenses: noninvolvement in the actual killing, and intoxication.

As to noninvolvement, petitioner contends that his counsel "could have discovered a crucial fact that would have made evident such a defense by simply interviewing the known, closest eyewitness to the crime, Lee Heath, which he never did." The "crucial fact"—not otherwise identified by petitioner—is presumably the comment appearing in the unsworn statement in the prosecution's possession that Heath saw someone resembling Marvell holding "what could have been a gun." Petitioner ignores the fact that in cross-examining Heath at the preliminary hearing his counsel pursued this precise issue, as shown in the footnote.[8] Petitioner's contention that his attorney was ineffective for failing to ask Heath in private what he in fact asked him under oath at the preliminary hearing is unpersuasive. Finally, as pointed out earlier, the fact (if such it was) that Heath only saw Marvell holding a gun on this occasion does not exculpate petitioner.

 As to the intoxication defense, petitioner stresses that his counsel "spoke with only one potential witness who could have corroborated his client's drug use." However, as demonstrated above, even the prosecution's more thorough investigation failed to yield a single witness who told the prosecution that he had seen petitioner ingest any drug at the party, though it produced two who stated that they did not see him do so. Counsel's failure to pursue an intoxication defense cannot establish ineffective representation where there is no

evidence that the failure prejudiced petitioner's cause. *Horne v. Peyton,* 356 F.2d 631 (4th Cir.1966), *cert. denied,* 385 U.S. 863, 87 S.Ct. 119, 17 L.Ed.2d 90 (1966); *Duarte v. Field,* 297 F.Supp. 41 (C.D.Cal.1969); *Slayton v. Weinberger,* 213 Va. 690, 194 S.E.2d 703 (1973). This is especially true where, as here, counsel has testified that his decision not to pursue the intoxication defense was tactical, and where the same decision was reached by counsel for codefendant Dunsdon after consulting with an experienced criminal trial attorney in Salt Lake City. We do not second-guess "an attorney's legitimate exercise of judgment, as to trial tactics or strategy." *State v. McNicol,* 554 P.2d at 205.

2. Petitioner's counsel entered, on petitioner's behalf, a plea of "not guilty by reason of insanity," which was not among the pleas authorized by the statute then in effect. U.C.A., 1953, § 77–24–1 (repealed 1980). When no evidence was found to support an insanity defense, counsel did not withdraw the plea but allowed the case to go to trial on that plea alone. The trial court instructed the jury not to consider the issue of insanity, the only affirmative defense raised by petitioner's attorney. Petitioner now argues that the "result of that instruction was, for all practical purposes, a directed verdict that the jury convict Gypsy Codianna." We disagree.

 Petitioner's counsel offered no affirmative defenses at trial, but he did contest the prosecution's case in an attempt to demonstrate a reasonable doubt as to petitioner's guilt. The trial court clearly instructed the jury that petitioner contested the accusation of guilt and was not relying solely on the defense of insanity for acquittal.[9] We cannot base a finding of ineffec-

---

**8.** Q. Did you see a gun at any time that you looked out of the window?
A. No, sir.
Q. So at that time you weren't sure whether these people that you saw were involved with a gun or not, did [sic] you?
A. No, sir, I didn't know.

**9.** On the first day of trial, after having the information read to the jury, the trial court stated:

Ladies and Gentlemen of the Jury, you are further instructed that the Defendants Gypsy Allen Codianna and Craig Derrickson Marvell have entered a plea to this Information of not guilty by reason of insanity; that the remaining Defendant, Irvin Paul Dunsdon, has entered a plea of not guilty to this Information. And that these pleas put in issue and cast upon the State the burden of prov-

tiveness of counsel on an invalid plea that was treated by the judge and apparently understood by the jury in precisely the same way as the proper plea of not guilty.

3. Petitioner contends that his trial was surrounded by "much prejudicial publicity and public comment." As a result, he argues, his counsel was ineffective for not objecting to the trial court's failure to forbid the jurors to read news reports about the case and to sequester the jury.

■ Petitioner claims that the court "explicitly gave the jurors permission to read reports about the case while admonishing them to ignore them." This argument refers to the court's statement to the jury at the conclusion of the third day of this six-day trial. Petitioner's claim is untrue, as is evident from the court's entire statement, reproduced in the footnote.[10] Even if the court committed error in recognizing that the jurors might receive information about the trial from newspapers, radio, or television and in merely cautioning them rather than forbidding them to do so, this was not such an obvious error that only an incompetent attorney could have failed to object to it.[11]

■ Furthermore, two months prior to trial, petitioner's counsel moved for a change of venue. His motion was supported by petitioner's affidavit alleging "public outrage over the offense of which I am charged, public hostility against me, and prejudicial news reporting that has inflamed the public, castigated me, and disclosed inadmissible evidence." Significantly, neither the examples of newspaper publicity attached to the affidavit nor anything else in the record supports the charge of actual prejudice from news reporting. An accused can be denied a fair trial where the process of news-gathering is allowed such a free rein that it intrudes into every aspect of a trial and creates a "carnival atmosphere" and where the publicity is so weighted against the defendant and so extreme in its impact that members of the jury are encouraged to form strong preconceived views of his guilt. *Sheppard v. Maxwell*, 384 U.S. 333, 358, 86 S.Ct. 1507, 1519, 16 L.Ed.2d 600 (1966). Nevertheless, "pretrial publicity—even pervasive, adverse publicity—does not inevitably lead to an unfair trial." *Nebraska Press Association v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976).

ing every element of the crime charged in the Information beyond a reasonable doubt.

At the conclusion of trial, after specifying the facts essential to a first degree murder conviction, the trial court instructed the jury as follows:

To the charge of murder in the first degree contained in the Information the Defendants Gypsy Allen Codianna and Craig Derrickson Marvell have entered pleas of not guilty by reason of insanity; the Defendant Irvin Paul Dunsdon has entered a plea of not guilty thereto.

By said pleas, the Defendants deny each and every material fact set forth above ... and thus have cast upon the state the burden of proving beyond a reasonable doubt each and all of said material facts.

10. You will undoubtedly read in the newspaper about this trial. You will probably hear it over the radio and over television. And from past experience sometimes there is no semblance between what you read and what you hear over the air and what you actually have heard in court. Now I am not going to impose a censorship and say you can't read the

paper or you can't listen to the radio or you can't listen to television. But bear in mind whatever they say, the papers or on the air, that is not consistent with what you have heard in court you must disregard. Because you have heard the evidence firsthand and they are relating it secondhand. So I just want you to bear in mind that what you have heard here in court is the evidence, not what you read in the newspaper. Not what you hear on the radio or television. Remember the admonition of the Court also. Do not talk about this case among yourselves or with anyone else. Do not let anyone speak about it within your hearing or presence and do not express or form any opinion concerning it until it is finally submitted to you.

11. A similar instruction was approved in *United States v. Clardy*, 540 F.2d 439 (9th Cir.1976), *cert. denied*, 429 U.S. 963, 97 S.Ct. 391, 50 L.Ed.2d 331 (1976). There, the federal judge stated, "But you read the paper, and you watch television, and am I supposed to sit here and say don't do that?" *Id.* at 445 n. 7.

■ In *State v. Wood,* Utah, 648 P.2d 71, 88–89 (1982), we held that the trial court committed no error in denying a motion for a change of venue based on a single newspaper article and counsel's affidavit. "In substance," we held, this amounted to "nothing more than a bare allegation of prejudice in the county." In *State v. Pierre,* Utah, 572 P.2d 1338, 1349 (1977), we declined to reverse a highly publicized case where the jury was not sequestered, declaring that "this is not one of those exceptional cases where pretrial publicity exacerbated by State complicity encouraged the jurors to form such strong preconceived views of the defendant's guilt as to be considered inherently prejudicial against him." Upon the same reasoning, we find no reversible error in the court's failure to sequester the jury in this case, and no ineffective assistance in counsel's failure to demand it.

4. The final and most substantial of petitioner's contentions is that the performance of his trial counsel was constitutionally deficient because of his failure to demand some jury instructions and to object to others.

First, in its instructions to the jury, the trial court repeatedly referred to "the defendants" collectively rather than giving separate instructions for each defendant or otherwise explicitly informing the jury that their verdict was to be reached independently for each defendant. For example, in instructing the jury on first degree murder, the court stated:

> Therefore, if you find from the evidence that the state has proved each and every material fact above set forth . . . beyond a reasonable doubt, it would be your duty to find the Defendants guilty of murder in the first degree. On the other hand, if you find from the evidence that the state has failed to prove any one of said material facts beyond a reasonable doubt, it would be your duty to find the Defendants not guilty of murder in the first degree . . . .

The jury was not specifically instructed that it could return a different verdict against petitioner than against his codefendants. Petitioner's counsel did not object to the above instruction, or request an instruction on the individual determination of guilt. Was this omission serious enough, alone or in company with other omissions discussed above, to constitute such a deficiency of performance that petitioner was denied his constitutional right to the effective assistance of counsel?

This question must be considered in light of the fact that other jury instructions often referred to the three defendants individually (by name) and phrased principles of law in singular rather than plural terms. In addition, neither of the counsel for petitioner's codefendants objected to the above instruction or requested an instruction on the individual determination of guilt. Finally, the jury was given a total of nine different verdict sheets, requiring the jury to select one of three possible verdicts (first degree murder, second degree murder, or not guilty) for each of the three defendants.

The evidence against the three defendants in the guilt phase was not identical: Marvell's and Dunsdon's clothing was marked with large amounts of blood of the victim's type, while petitioner's clothing showed only a trace of blood, not enough to type. Heath testified that one of the three men in front of Hogan's house the night of the murder resembled Marvell and that he had seen Marvell fighting with Hogan three weeks before the murder. A knife was confiscated from Marvell at the time of the arrest. Marvell's and petitioner's boots were shown to be similar to footprints near where the body was discovered. In addition, the depositions and witness statements not disclosed by the prosecution, which we have held would not create a reasonable doubt of petitioner's guilt (Part III), indicated that Marvell had previously threatened Hogan's life, that petitioner supplied the rifle used in the murder, that Dunsdon had intended to beat up Hogan, and that Dunsdon possessed brass knuckles the night of the murder. (Dunsdon himself testified to the latter two facts in the penalty phase.)

■ Because the evidence against the three defendants was not identical, the trial

court's refusal to give a requested instruction expressly requiring the jury to decide each defendant's guilt or innocence separately might have been error. *State v. Parrish,* 275 N.C. 69, 165 S.E.2d 230 (1969). *State v. Freeman,* 85 Idaho 339, 379 P.2d 632 (1963); *McDaniel v. State,* 74 Ga.App. 5, 38 S.E.2d 697 (1946). However, it does not follow that petitioner's counsel was constitutionally ineffective for failing to demand such an instruction.

The central facts undergirding the state's case incriminated all three defendants equally: Three men entered Hogan's house and dragged him out. Three men were seen in the cab of a pickup leaving the scene of the abduction. Three men—the three defendants—were apprehended in that pickup just thirty minutes later, after the murder. The rifle identified as having fired at least four of the bullets removed from Hogan's body—as well as the spent shells near the body and in front of Hogan's house—was found in the pickup with the three codefendants. There was blood of Hogan's type on the pickup. The pickup's tracks were traced to Hogan's body in the canyon (its tires were positively identified as having made the tire tracks in the canyon where the body was found). Soil found in the cab of the pickup matched soil removed from the top of a beer can found near the body. Three distinct sets of footprints were visible where Hogan's body had been dragged through the snow. Significantly, the court below made no exception for petitioner Codianna in concluding that "[t]here was overwhelming evidence of guilt presented at the guilt phase of petitioners' trial."

█ In view of the separate verdict forms used by the jury in this case, and in view of the highly incriminating evidence against petitioner and his codefendants, summarized above, it is unlikely that an instruction on separate determination of guilt, if requested and given, would have averted a guilty verdict in petitioner's case. Certainly petitioner has not established such prejudice as "a demonstrable reality and not a speculative matter." *State v.*

*McNicol,* 554 P.2d at 204. We cannot base a holding that petitioner's counsel was constitutionally ineffective on an error not shown to be likely to have prejudiced petitioner's cause. *Horne v. Peyton, supra; Duarte v. Field, supra; Slayton v. Weinberger, supra.*

Second, petitioner observes that although the trial court instructed the jury on the lesser included offense of second degree murder, it omitted one definition of second degree murder that might have been helpful to petitioner's case: a death caused "in the commission ... or attempted commission of ... burglary ... or kidnapping ...." U.C.A., 1953, § 76–5–203(1)(d). Petitioner's counsel neither requested such an instruction nor objected to the court's failure to give one of its own.

█ What has been said about the instruction on individual guilt applies to this omission also. We have held that "where the parties so request they are entitled to have instructions given upon their theory of the case, and this includes on lesser offenses if any reasonable view of the evidence would support such a verdict." *State v. Gillian,* 23 Utah 2d 372, 374, 463 P.2d 811, 812 (1970). However, we have never held that failure to make such a request automatically brands counsel incompetent in the constitutional sense. Counsel need not recognize and raise every possible objection in order to meet the competence standard. Of course, failure to request a pertinent instruction could be evidence of faulty performance by counsel where evidentiary support for the instruction was compelling. Here it was not, and as a result counsel's omission adds nothing to petitioner's contention that he was denied the effective assistance of counsel.

The performance of petitioner's counsel was constitutionally sufficient under the standard in *State v. McNicol, supra,* as elaborated here. As the United States Supreme Court said in *Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 1574, 71 L.Ed.2d 783 (1982), "[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every con-

ceivable constitutional claim." *See also* *Guzzardo v. Bengston,* 643 F.2d 1300, 1305 (7th Cir.1981).

Petitioner Codianna received competent representation and a fair trial. Our Constitutions require no more than this. The judgment of the district court denying postconviction relief is affirmed.

HALL, C.J., HOWE, J., and CALVIN GOULD, District Judge, concur.

DURHAM, J., does not participate herein.

STEWART, Justice (concurring in result).

I concur generally with the majority opinion. However, because that opinion states and applies only part of the relevant Utah law on habeas corpus, I think it appropriate to point out that there are other principles of Utah habeas law that also apply to this case. Furthermore, it is my express understanding that the majority opinion, in not referring to a line of Utah habeas cases applying those principles, does not intend to alter present Utah habeas corpus law.

The majority opinion states that habeas is not available to review errors which were known or should have been known at trial unless there are "unusual circumstances." Certainly the contemporaneous objection rule and the rule requiring alleged trial errors to be raised on direct appeal are important rules of procedure designed to promote a number of important judicial policies, which need not be enumerated here. There is no quarrel with the general applicability of those rules. Nevertheless, there are numerous Utah cases which have addressed the merits of habeas claims even though the issues raised were known or should have been known to petitioner and his counsel at the time of conviction and could have been raised on appeal. The majority opinion does not purport to undermine these cases.

Indeed, *Brown v. Turner,* 21 Utah 2d 96, 440 P.2d 968 (1968), the basic authority relied upon in the majority opinion for the proposition that errors alleged by a habeas petitioner, which were known or should

have been known at the time of conviction, may not be reviewed on habeas absent "unusual circumstances," is one such case. In *Brown* this Court in fact addressed the merits of the habeas petitioner's claims; it did not dismiss them solely on the ground that the alleged errors were known or should have been known at the time of conviction. The petitioner's claims in that case were that he had been denied his right to counsel and that he was not properly advised of the consequences of his plea of guilty. A reading of the opinion makes clear that the petitioner either knew or should have known at the time of his conviction of those errors that were later asserted in his habeas petition. Although the Court ruled that there was no merit to those claims, the critical point here is that the Court deemed it entirely appropriate to address the merits even though petitioner had failed to take a direct appeal.

Numerous other Utah cases have also addressed the merits of a petitioner's claims even when the claims "were known or should have been known to petitioner and his counsel at the time of his conviction." *E.g., Chess v. Smith,* Utah, 617 P.2d 341 (1980); *Pierre v. Morris,* Utah, 607 P.2d 812 (1980); *Martinez v. Smith,* Utah, 602 P.2d 700 (1979); *Helmuth v. Morris,* Utah, 598 P.2d 333 (1979); *Gonzales v. Morris,* Utah, 610 P.2d 1285 (1980); *Rammell v. Smith,* Utah, 560 P.2d 1108 (1977); *Allgood v. Larson,* Utah, 545 P.2d 530 (1976); *Bryant v. Turner,* 19 Utah 2d 284, 431 P.2d 121 (1967).

A more full statement of the Utah law on habeas corpus than that stated in the majority opinion was expressed for a unanimous court by Mr. Justice Crockett (who was also the author of *Brown v. Turner*) in *Martinez v. Smith,* Utah, 602 P.2d 700 (1979):

It is true that we have repeatedly declared that any claims of error or impropriety should be asserted in the regular procedure provided for on appeals and that, if that is not done, a writ of habeas corpus may not be used as a belated appeal. Nevertheless, howsoever desirable it may be to adhere to the rules, the

law should not be so blind and unreasoning that where an injustice has resulted the victim should be without remedy. For that reason, as indicated in the cited cases, the writ should be available in rare cases, where it appears that there is a strong likelihood that there has been such unfairness, or failure to accord due process of law, that it would be wholly unconscionable not to reexamine the conviction. *Id.* at 702 (footnotes omitted). This statement of the rule, also found in several other opinions, is wholly consistent with Rules 65B(f) and (i) of the Utah Rules of Civil Procedure which state in large part the basic principles upon which Utah habeas corpus law is founded.

I agree that the writ of habeas corpus should not be available to permit ingenious defendants to deliberately forego asserting claims in the trial court or on a direct appeal for the purpose of preparing a fall-back position in a habeas proceeding if the conviction is affirmed. However, the courts are fully competent to deal with that kind of problem without resorting to inordinately rigid rules that fail to take into account the realities of our criminal justice system, including the possibility of greater error because of overburdened prosecutors and swamped public defenders. Under Utah habeas law, giving due weight to *all* our cases, a procedural default is only one factor to be considered in deciding whether a habeas court should address the merits of claim. That factor in all cases must be viewed against the possibility that a serious injustice may have resulted from a defective trial. This State has long taken the firm position that a procedural default is not, and cannot be, solely determinative of the ultimate question of whether a trial on the merits was conducted according to fundamental concepts of basic fairness. The mechanical and inflexible application of legal procedures must not be used to overwhelm the law of the land and permit a miscarriage of justice.

Nowhere does the majority undertake an analysis of the "unusual circumstances" or "unconscionability" test. It is true that the majority refers to petitioner's claim of "unusual circumstances" in dealing with the petitioner's attempt to justify the failure to raise certain issues on direct appeal. The unusual circumstance alleged is the "inexperience" of petitioner's counsel in criminal cases. I agree that petitioner's averment is without merit as to that point, but more fundamental is the proposition that the "unusual circumstance rule" has not been defined by this Court solely in terms of inadequacy of counsel, or any particular procedural default. Incompetency of counsel would surely require habeas review, but that has never been thought to be the only basis for habeas review. Rather, the unusual circumstances test was intended to assure fundamental fairness and to require reexamination of a conviction on habeas corpus when the nature of the alleged error was such that it would be "unconscionable not to reexamine," *Martinez v. Smith, supra,* at 702, and thereby to assure that "substantial justice [was] done," *Brown v. Turner, supra,* at 98, 440 P.2d at 969–70. *See also Chess v. Smith, supra.*

Under the standards applied in *Brown, supra, Chess v. Smith, supra,* and the standards stated in Rule 65B(f) and (i)(1), I concur in the majority's conclusion that on the basis of the pleadings and the briefs of the parties, petitioner is not entitled to relief with respect to the adequacy of the *voir dire,* the contention that there was not an individual determination of guilt, the claim that the jury was not properly instructed on the first degree murder charges, and the contention with respect to the second degree murder instruction. I do not believe that there was such a "strong likelihood that there has been such unfairness, or failure to accord due process of law," that it is necessary to reexamine the conviction to prevent a miscarriage of justice. *Martinez v. Smith, supra,* at 702.

Nevertheless, I believe that it should be emphasized, for the purpose of avoiding possible problems in the future, that the trial court's instruction to the jury (which is set out in footnote 10 of the majority opinion) with respect to jurors reading the

newspapers, listening to the radio, and watching television is clearly inappropriate. Jurors must decide a case solely on the basis of the evidence presented in the court room, and not on the basis of community feeling, or the opinions or accounts of those who publish news in the mass media. In my view, the jury should be explicitly told, and frequently reminded, that they should avoid listening to all reports concerning the trial and the defendants whether on radio or television and avoid reading any such reports in the newspaper. If that is not sufficient to assure a fair trial, the jurors should be sequestered.

In the instant case, there is no indication that any juror, in fact, received any information from newspapers, radio or television, or that if he did, he was in any way influenced by that information. Furthermore, no effort was made at trial to ask the trial judge to canvass the jury members to determine whether they had received any such information, and there is no evidence in this case to suggest that the jurors did receive such information. Surely the lawyers who tried this case were aware of what was transpiring in the community and, if the occasion had warranted, could have sought a remedy. On the record before us there is no basis to conclude that the trial of this matter was prejudiced by outside, non-evidentiary information reaching the jury.

I concur in the remainder of the majority opinion.